**Randy BLADES, Collin Cain, Fredrick L. Samples, Mark A. Jent, Roger Rivest, on behalf of themselves and all others similarly situated, Plaintiffs,**

Bob McIntosh, C–K Farms,
Plaintiffs–Appellants,

v.

MONSANTO COMPANY, Pioneer Hi–
Bred International, Inc., Syngenta
Seeds, Inc., Defendants–Appellees,

Syngenta Crop Protection,
Inc., Defendant,

Aventis Crop Science Usa Holding,
Inc., Defendant–Appellee.

No. 03–3993.

United States Court of Appeals,
Eighth Circuit.

Submitted: Sept. 13, 2004.

Filed: March 7, 2005.

Rehearing Denied April 22, 2005.

564

Michael D. Hausfeld, argued, Washington, D.C. (Richard S. Lewis and Richard A. Koffman, Washington, D.C., Joseph F. Devereux, Jr. and Richard P. Sher, St. Louis, MO, on the brief), for Appellant.

John H. Beisner, argued, Washington, D.C. (Lisa A. Pake, Haar and Woods, LLP, St. Louis, MO, Timothy G. Barber, Bradley C. Morris, K. Matthew Miller, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Charlotte, NC, on the brief for Aventis CropScience USA Holding, Inc.; Stephen H. Rovak, Stephen J. O'Brien, Sonnenschein, Nath & Rosenthal LLP, St. Louis, MO, Philip D. Bartz, Cameron Cohick, Donna M. Donlon, Stephen M. Lastelic, McKenna Long & Aldridge LLP, Washington, D.C., Phillip A. Bradley, McKenna Long & Aldridge LLP, Atlanta, GA, on the brief Monsanto Co.; Andrew Rothschild, Duane Coleman, C. David Goerisch, Lewis, Rice & Fingersh, L.C., St. Louis, MO, Jame P. Denvir, III, Scott E. Gant, Paul Kunz, Boies, Schiller & Flexner LLP, Washington, D.C., on the brief for Pioneer Hi-Bred Int'l, Inc.; Thomas B. Weaver, Glenn E. Davis, Daniel C. Nelson, Armstrong Teasdale LLP, St. Louis, MO, Vincent R. FitzPatrick, Jr., Robert A. Milne, Michael J. Gallagher, Jack E. Pace, III, White & Case LLP, New York, N.Y., on the brief for Syngenta Seeds, Inc.), for Appellees.

Before MORRIS SHEPPARD ARNOLD, BRIGHT, and FAGG, Circuit Judges.

BRIGHT, Circuit Judge.

Plaintiffs/Appellants brought this case as a putative class action under sections four and fifteen of the Clayton Act, 15 U.S.C. §§ 15 & 16, for treble the damages caused by an alleged price-fixing conspiracy in violation of section one of the Sherman Act, 15 U.S.C. § 1. Appellants appeal from the district court's[1] denial of their motion to certify two classes. We affirm.

## I. Appellants' Allegations and Procedural History

Appellants allege as follows: Monsanto wished to extract the monopoly profits it would have earned from certain genes it had patented, which could be used to develop genetically modified corn and soybean seeds (GM seeds).[2] But Monsanto had surrendered its monopoly over the genes by giving broad licenses to Pioneer and Syngenta. Monsanto therefore secured the agreement of Pioneer and Syngenta to inflate the prices of their own GM corn and soybean seeds, to support Monsanto's technology fees (for inclusion of the patented genes in seeds Monsanto sold) rather than to undercut the fees through normal price competition. Monsanto propped up its technology fee also by securing the agreement of Appellee Aventis to limit its production of LibertyLink soybean seeds, which competed with the GM soybean seed sold by Monsanto, Pioneer, and Syngenta. The parties to the conspiracy performed their obligations under their illegal agreement to an extent sufficient to injure all members of the proposed classes.

Appellants moved for certification of two classes. The first class consisted of farm-

---

1. The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

2. Throughout, references to GM seeds refer only to Roundup Ready soybean seeds or Yieldgard corn seeds—the seed types developed with Monsanto's patented genes.

ers (other than as distributors) who, from 1996 to present, purchased Roundup Ready soybean seeds or the right to grow the seeds directly from one of the defendants. The second class consisted of farmers (other than as distributors) who, from 1996 to present, purchased Yieldgard corn seeds or the right to grow the seeds directly from one of the defendants. Appellants sought certification of these classes under Fed. R.Civ.P. 23(b)(3), which provides for class certification if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

■■■ To recover damages under section four of the Clayton Act, plaintiffs must prove defendants violated the antitrust laws and that plaintiffs suffered some resulting injury, and plaintiffs must estimate the measure of damages. *Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1490 (8th Cir.1992). Appellants allege a price-fixing conspiracy in violation of section one of the Sherman Act. For a class to be certified, plaintiffs need to demonstrate that common issues prevail as to the existence of a conspiracy and the fact of injury. *See In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 135–40 (2d Cir.2001). The district court found that plaintiffs satisfied the Rule 23(a) prerequisites to a class action, but that common questions do not predominate over individual questions. The district court held that neither the existence of a conspiracy to fix prices, nor the existence of some resultant harm constitute questions common to the class.

## II. Standard of Review & Class Certification Law

A district court's denial of class certification is reviewed for abuse of discretion.

*Chaffin v. Rheem Mfg. Co.,* 904 F.2d 1269, 1275 (8th Cir.1990). The district court's rulings on issues of law are reviewed *de novo,* and the court abuses its discretion if it commits an error of law. *Emery v. Hunt,* 272 F.3d 1042, 1046 (8th Cir.2001). The district court also abuses its discretion if its conclusions rest on clearly erroneous factual determinations. *Forest Park II v. Hadley,* 336 F.3d 724, 731 (8th Cir.2003).

■■■ The requirement of Rule 23(b)(3) that common questions predominate over individual questions "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual. *See In re Visa,* 280 F.3d at 136–40. If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question. *See id.*

■■■ To determine whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings. *See General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In conducting this preliminary inquiry, however, the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs general allegations are true, common evidence could suffice to make out a prima facie case for the class. *Cf. Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). *See also In*

*re Visa*, 280 F.3d at 134–35. When the decision on class certification comes before full merits discovery has been completed, the court must. necessarily conduct this preliminary inquiry prospectively. A decision to certify or not to certify a class may therefore require revisiting upon completion of full discovery.

The preliminary inquiry at the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case. *See Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir.2001). *See also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166–69 (3d Cir. 2001). Nonetheless, such disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class. The closer any dispute at the class certification stage comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would require. *Cf. Eisen*, 417 U.S. at 177–78, 94 S.Ct. 2140.

### III. Factual Background

The parties do not dispute the essentials of the factual setting of this case.[3] In the early 1990's, Appellee Monsanto was a producer of genetic research pertinent to the seed industry but was not itself a major producer of seeds. Monsanto had developed a genetic modification for soybean seeds which made the plants resistant to Roundup, a widely-used herbicide, and a genetic modification for corn seeds which made them resistant to the European Corn Borer, a pest. While Monsanto enjoyed a lawful monopoly over these genes, by virtue of its patents, it was unable to commercialize the genes itself. In 1992 and 1993, Monsanto granted broad licenses to Appellees Pioneer and Syngenta, major seed producers and distributors, to develop commercial seeds using these patented genes, thus surrendering its monopoly over the genes. The licenses did not restrict in any material way Pioneer's or Syngenta's development, marketing, or pricing of seeds containing the genes. For the soybean licenses, Monsanto received full up-front. payment from both Pioneer and Syngenta. For the corn licenses, Monsanto received full up-front payment from Pioneer. Syngenta's corn license required payment of royalties which floated with whatever premium Syngenta might charge for its GM corn seed sales as compared to its nonGM corn seed sales.

After thus surrendering its patent-derived monopoly over the seed genes to two major seed producers, Monsanto in the mid–1990's became a major seed producer in its own right. Monsanto also began licensing many other independent seed companies to produce and sell seeds using the patented genes. These licenses, and Monsanto's own sales of GM seeds, required payment of specified "technology fees," separately invoiced, as payment for use of the patented genes. Pioneer and Syngenta, however, were free to price their GM seeds solely with regard to ordinary price competition—and thus to undercut the prices of GM seeds bearing the additional cost of Monsanto's technology

---

**3.** Contrary to Fed. R.App. P. 30(d), roughly 1,400 pages of appellees' submissions in the Joint Appendix, containing many discrete reports, depositions, and exhibits of economic experts, are identified in the table of contents by only two general headings. This has rendered more difficult our task of identifying in detail the parties' agreements and disputes concerning the factual setting of the case.

fee. Pioneer and Syngenta thus threatened Monsanto's ability to collect the monopoly profits it would have been able to collect had it retained the monopoly conferred by its patents.

Appellees Pioneer and Syngenta are major producers of seeds and compete with each other nationwide. Many other firms with local or regional scope are licensed to sell the GM corn and soybean seeds at issue here.

In general, the seed industry markets many hybrids of any general type of seed. Specific hybrids are developed with a variety of traits addressed to such variable factors as soil quality, rates of growth, aridity, severity of pest or weed problems, food qualities, and so on. The GM corn and soybean seeds each come in many varieties. Monsanto sold over fifty corn hybrids and approximately 120 soybean. Syngenta sold approximately thirty of each, and Pioneer approximately fifty of each. Both seed types were sold nationwide, though sales of some hybrids were geographically limited. In many cases GM corn hybrids were sold alongside corresponding non-GM hybrids, which were substantially similar, except for lacking the patented genetic modification. GM soybean hybrids generally did not have corresponding non-GM hybrids.

Appellees distributed GM seeds either through their own representatives or through retailers and distributors. (The proposed classes include only farmers who bought GM seeds—or the permission to grow them—directly from appellees.[4])

## IV. District Court's Ruling and Discussion

The record is extensive. The district court made a careful analysis of the evidence and came up with the following resolution rejecting the argument that all members of the class would be able to use the same evidence to prove that they sustained some damage from the alleged conspiracy:

### Rule 23(b)(3): Predominance

Plaintiffs must meet all requirements of Rule 23(a) and fall within one of the categories of Rule 23(b) to certify their antitrust claims as a class action. *Amchem Products, Inc. v. Windsor*, 521

---

4. Appellees argue that the proposed classes include indirect purchasers of GM seeds. Appellees note that the class definitions allow for the possibility that some farmers in the classes will have obtained the physical seeds from sources other than appellees, but will have purchased the licenses to grow the seeds directly from appellees. The class definitions indeed seem to allow for this. The parties, however, give this question only cursory treatment, and the factual record is silent concerning the operation of such transactions. The significance of this aspect of the class definitions given the factual setting of the case is therefore unclear. The question whether such farmers were direct or indirect purchasers is a combined question of law and fact. The district court, in its order of September 19, 2003, denying summary judgment, left the question unresolved. The specific instance then before the district court concerned a farmer who bought GM seed from an independent dealer licensed by Monsanto, was separately invoiced for the technology fee, and paid it to the dealer, who remitted it to Monsanto. The farmer then separately obtained a license directly from Monsanto to plant the seed (i.e., to use the patented gene to grow a commercial crop). As to this particular case, we agree with the district court's apparent conclusion that this transaction is functionally indistinguishable from a direct purchase of both the seed and the license from an agent of Monsanto. The record does not reveal the factual nature of such transactions in general, beyond the single transaction before the district court. Because the parties' arguments on the question whether such transactions are *generally* direct or indirect are cursory, because the district court did not resolve the question, and because the factual record is inadequate as to the issue, we put the question to the side, without deciding it.

U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). As stated above, plaintiffs seek to certify their antitrust classes under Rule 23(b)(3), the so-called "common question" or "damages" class action. To certify a class action under Rule 23(b)(3), the Court must find that: 1) common questions predominate over any questions affecting only individual members; and 2) class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R.Civ.P. 23(b)(3); *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231. Because plaintiffs cannot meet the predominance requirement, I am not authorized to certify the proposed classes.

In seeking class certification, plaintiffs have the burden of demonstrating that, as required by Rule 23(b)(3), "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." This necessarily requires an examination of the underlying elements necessary to establish liability for plaintiffs' claims. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir.2001). A plaintiff seeking treble damages under of [sic] § 4 of the Clayton Act, 15 U.S.C. § 15, must establish an antitrust violation (here, the alleged conspiracy to fix prices) and the fact of damage or injury, i.e., impact. *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th Cir.1992); *In re MSG*, 205 F.R.D. at 232. Thus, to satisfy the "predominance" standard, plaintiffs must show that both conspiracy and impact can be proven on a systematic, class-wide basis. Plaintiffs cannot satisfy either of those prongs.

Plaintiffs have not Demonstrated that Antitrust Impact can be *Measured on a Class–Wide Basis with Common Proof*

To establish cognizable injury under Section 4 of the Clayton Act, plaintiffs must prove that the class members suffered injury to their "business or property," i.e., impact, as a result of the violation. *See State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir.1978); *Midwestern Machinery v. Northwest Airlines, Inc.*, 211 F.R.D. 562, 571 (D.Minn.2001). The importance of the impact requirement cannot be understated, as noted by the court in *Blue Bird*:

> In making the determination as to predominance, of utmost importance is whether impact should be considered an issue common to the class and subject to generalized proof, or whether it is instead an issue unique to each class member, and thus the type of question [that] might defeat the predominance requirement of Rule 23(b)(3).

573 F.2d at 320. "[P]roof of injury in a price-fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supracompetitive prices . . . ." *Id.* at 327. To establish antitrust impact, an expert is "required to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir.2000) (internal quotation marks omitted).

To meet their burden of proof, plaintiffs offered up expert testimony from Dr. Leitzinger. Defendants have asked me to apply the test of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and to disregard his testimony. I will deny defendants' motion in *limine* as I believe it is appropriate for me to consider all evidence at this stage of the proceedings. I have considered

all expert testimony offered by both sides in support of or in opposition to class certification and have afforded that testimony such weight as I deemed appropriate. However, Dr. Leitzinger's testimony does *not* show that impact can be demonstrated on a class-wide basis.

Simply put, plaintiffs *presume* class-wide impact without any consideration of whether the markets or the alleged conspiracy at issue here actually operated in such a manner so as to justify that presumption. Dr. Leitzinger *assumes* the answer to this critical issue and plaintiffs, in turn, have asked the Court to rely on this *conclusion* as support for class certification. I cannot "presume" or "assume"—much less "conclude"—class-wide impact here because the evidence submitted during the class certification hearing demonstrates that such a presumption would be improper.

First, the genetically modified seeds are not homogenous products. The market for seeds is highly individualized depending upon geographic location, growing conditions, consumer preference and other factors.

Second, plaintiffs allege that only the "premium" portion of the seed product is the result of the price-fixing scheme, but the germplasm component of the seed cannot be segregated from the rest of the seed. The evidence demonstrated that defendants and their distributors often lowered the "overall" price of certain seeds, or gave discounts or rebates to certain farmers to offset any alleged premium, and that some farmers in fact paid no premium.

Another reason that the actual prices paid by farmers cannot be determined with common proof is that the GM seeds were not offered for sale at a uniform price. Plaintiffs suggested that defendants' nationwide price lists could be used for this purpose, but the evidence offered during the certification hearing demonstrated that these lists did not reflect the actual price paid by farmers. Plaintiffs also suggested that this issue could be resolved through a "claims procedure" that would be implemented after the class certification process. This argument is meritless. The amount of premiums paid, if any, is relevant to a determination of impact, an essential element of a price-fixing claim, and is not merely an assessment of the amount of damages, which may be properly ascertained at a later time. It is clear that this determination cannot be made on a class-wide basis, but would involve a fact-intensive inquiry unique to each potential class member.

Dr. Leitzinger attempted to measure the premium by comparing the price of GM seeds to conventional seeds, but in many instances the GM seeds have no conventional counterpart. Therefore, it would be impossible to determine the amount of premium paid. In addition, Dr. Leitzinger conceded that even this calculation might not accurately affect the amount of the premium because insertion of the GM trait might affect other agronomic characteristics of the seed which might otherwise affect the price.

Plaintiffs cannot determine the "but-for" marketplace necessary to establish antitrust impact without a reliable methodology to determine the premiums paid by farmers. In fact, the evidence presented at the class certification hearing showed that supply-and-demand conditions for seed sales vary to such a great extent that the "but-for" prices could be determined only through individualized inquiries for each potential class member. These factors include growing seasons and conditions, regional varieties and farmer preferences. Common proof

simply cannot be used to establish a "but-for" marketplace in this situation, particularly where the evidence showed that the actual prices paid by many farmers was well below Monsanto's technology fee.

Finally, I am not persuaded that the alleged conspiracy could even be proven with common evidence. The dynamics of this localized industry make it highly unlikely that the existence and workings of the alleged conspiracy could be shown through common proof.

In sum, after carefully considering all the evidence submitted during the class certification hearing, I am convinced that the impact of defendants' alleged antitrust violations cannot be shown on a class-wide basis with common proof. Instead, it is a highly individualized, factintensive inquiry that necessarily requires consideration of factors unique to each potential class member. The variety of GM seeds purchased, geographic location, growing conditions and the terms of purchase are all relevant to a determination of impact and cannot be shown with common proof on a classwide basis. Plaintiffs did not meet their burden of establishing the necessary elements of Rule 23(b)(3) through the testimony of Dr. Leitzinger, whose "assumptions," "presumptions" and "conclusions" fall far short of actually *establishing* antitrust impact on a class-wide basis through common proof.

J.A. at 70–76 (emphasis in original) (footnote omitted).

## V. Analysis and Ruling to Affirm

 In our review, parts of the extensive evidence produced in this case demonstrate that not every member of the proposed classes can prove with common evidence that they suffered impact from the alleged conspiracy. The ability to use common evidence to show impact on all class members cannot always be assumed. *See, e.g., Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 326–28 (5th Cir.1978).

Here damages to all class members must be shown to justify the class action. The district court noted, and appellees emphasize, the following:

(1) Since individual seed varieties can be used only in particular geographies, the characterization of list prices as "national" is misleading and does not reveal a "nationwide" approach to pricing;

(2) List prices for each of the hundreds of individual seed varieties were set in reference to local competitive circumstances;

(3) List prices differed [from] variety to variety, and sometimes differed from region to region for a single variety;

(4) List-price *premiums* varied significantly as well, and frequently were substantially lower than the Monsanto technology fee;

(5) Many discounts on seeds were anything but formulaic—Syngenta alone had over 150 seed discount programs, and regional sales representatives were authorized to negotiate *ad hoc* discounts in the field, frequently involving free goods; and

(6) Heavy and variable discounting led to wide variation in the prices that farmers actually paid, and widespread examples of Pioneer and Syngenta seeds being sold at zero or near-zero premiums.

Appellants challenge the district court's conclusion that the element of conspiracy, the violation of the antitrust laws necessary to recover treble damages under the Clayton Act, could not be proved on a classwide basis with evidence common to the class. The district court's single-sentence explanation of its holding is that, "The dynamics of this localized industry

make it highly unlikely that the existence *and workings* of the alleged conspiracy could be shown through common proof." J.A. at 76 (emphasis added).

 The district court appears to have held that to prove the conspiracy element, plaintiffs must prove not only the existence of an agreement, but also that defendants actually performed the actions they agreed upon. If it did, it erred. The mere act of agreeing to raise prices, even if the undertaking agreed upon is "wholly nascent or abortive," violates the prohibition of conspiracies in restraint of trade of section one of the Sherman Act. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). If the existence of the agreement is proven, the conspiracy is proven. *See* FED. JURY PRAC. & INSTR. § 150.20.

The performance of the obligations defendants undertook by virtue of the agreement is not a separately treated element of a conspiracy claim but goes rather to the element of resultant injury. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1054–55 (8th Cir.2000). Performance of a price-fixing conspiracy necessarily implies injury. *Cf. Socony–Vacuum*, 310 U.S. at 218, 60 S.Ct. 811.

Evidence that appellees entered into a conspiracy that would affect all class members would perforce be evidence common to all class members for proving the conspiracy. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir.2002); *see also* 6 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 18:28 (4th ed.2003). However, proof of conspiracy is not proof of common injury.

We affirm the district court's holding that appellants cannot prove classwide injury with proof common to the class.

The district court's discussion of this issue cites the following reasons: (1) farmers buying GM seeds often received varying discounts from the list prices, so each farmer would have to prove separately that he paid an actual transaction price that was supra-competitive; (2) the market for seeds is highly individualized, requiring particularized evidence to determine the competitive price that would have prevailed in the locality of any individual farmer; (3) prices for GM seeds varied widely, and some farmers paid negligible premiums or no premiums at all for GM seeds, as compared with corresponding non-GM seeds; (4) plaintiffs' expert did not show that the fact of injury could be proven for the class as a whole with common evidence.[5]

We rely on the second, third, and fourth of these holdings. The wide variation in list prices among hybrids and the pricing of some GM hybrids with zero or negligible list price premiums, as compared with corresponding non-GM hybrids, would require the purchasers of some hybrids to prove injury through evidence that would vary according to individualized market conditions and thus would not be shared in common with the rest of the proposed classes.[6] For the above stated reasons, we affirm the denial of class certification.

The district court's memorandum and order does not distinguish between list prices and transaction prices, or between list premiums and transaction premiums.

---

5. J.A. at 73–76.

6. The district court found that premiums could not be determined by comparing GM seeds to conventional seeds because there was no proof that the conventional seeds were the same but for the GM trait (*i.e.*, it found that

genetic modification could cause other differences). After a thorough evaluation of the record, we have concluded that this finding cannot be supported as to the corn seeds, and we do not rely upon it for affirmance.

The court noted that in addition to instances in which list prices were discounted, there were cases in which there were no premiums at all. It is clear from our review of the record that the district court was presented with undisputed evidence not only that list prices among hybrids varied greatly, but that in a substantial number of cases, where GM hybrids existed alongside corresponding non-GM hybrids, the list prices showed negligible list-price premiums, and in some cases no list premiums at all. Therefore we take the district court's statement that "some farmers in fact paid no premium" at all to refer in part to cases in which corresponding list prices showed no list-price premium for GM seeds.

To prove that the members of the proposed classes were injured by paying supra-competitive prices for GM corn and soybean seeds, each plaintiff must be able to present evidence from which a jury could reasonably infer that the competitive price was less than the price the plaintiff paid. Appellants proffered to the district court certain circumstantial evidence that they have now in hand (even without full merits discovery) that is common to all members of the proposed classes. Appellants' evidence consists of, for instance, Monsanto's projection that, absent collusion, its technology fees would be competed away in the course of four years, combined with evidence showing that in fact the fees were not competed away; financial records of Pioneer and Syngenta quantifying average GM seed premiums for their own sales close in amount to Monsanto's technology fees; documents from appellees indicating that they had given thought, in devising the agreement, to creating techniques to ensure that the agreed-upon premiums would be genuine and effective; documents showing that appellees were able to estimate the premiums (not publicly identified) which their co-conspirators had put into place.

Given the facts of this case, however, the above evidence suggesting that appellees adhered to a price-fixing agreement that raised the average price of GM seeds does not make the case—which appellants must make in order to certify the proposed classes—that appellees' adherence extended to hundreds of list prices. It is undisputed that there were many hybrids of both corn and soybean seeds, and that list prices varied widely among hybrids, for both general types. For corn seeds, in many cases a GM hybrid had a corresponding non-GM hybrid. Because no price-fixing conspiracy is alleged as to non-GM hybrids, such pairings establish clear list-price premiums for the GM corn hybrids. Appellees submitted to the district court, and appellants did not dispute, that some GM corn hybrids had zero or negligible list-price premiums. While a negligible or zero list premium may not conclusively establish the absence of price inflation as to the hybrid at issue, such a premium presents very different factual issues, and requires different proof, than do list premiums that approximate Monsanto's technology fee.

The undisputed presence of negligible and zero list premiums indicates that if appellees performed their agreement, their performance was not across the board, but extended to some list prices and not to others. Consequently, to show injury from price inflation, each plaintiff would need to present evidence that the list prices of the seeds he purchased, not just some or even most of the hundreds of list prices on appellees' price lists, were inflated. Evidence that appellees performed their agreement so as to raise the average price of GM seeds, without inflating all list prices, might suffice to make a case that list prices in a certain higher range were

inflated. Nonetheless it is clear that some potential class members would require particularized evidence showing that the specific list prices pertinent to them were included in any performance of appellees' agreement to inflate prices.

Appellants have neither proffered common evidence that they have now in hand nor identified any type of common evidence that may yet be discovered which could show injury to purchasers of GM seeds with negligible or zero list premiums. Given appellants' lack of any other type of common evidence, the district court did not abuse its discretion in concluding that some proposed class members would be forced to fall back on a comparison of actual list prices to hypothetical competitive prices. The court did not abuse its discretion in concluding that, because of the variety of hybrids and the varying factors affecting list prices, the construction of hypothetical competitive prices would require evidence that varied among hybrids and perhaps across geographical pricing regions. The evidence showed the presence of individualized market conditions, which would require individualized, not common, hypothetical markets—thus individualized, not common, evidence.

■■■ GM soybean seeds, unlike corn seeds, generally did not have corresponding non-GM hybrids, and clear list premiums therefore cannot be determined for them. Given the similarities in pricing and marketing between the GM corn and soybean seeds, however, the district court did not abuse its discretion in treating the two alike.[7]

The district court concluded that appellants' expert did not show that injury could be proven on a classwide basis with common proof. While a persuasive expert opinion is not the sine qua non of class certification, see, e.g., In re Linerboard Antitrust Litig., 305 F.3d at 151–53, we affirm this holding as well. Appellants' expert did not show that other common evidence could fill the gap in proof of classwide injury that is left by appellants' evidence that appellees performed their price-fixing agreement as to some (but not all) list prices.[8]

---

7. In addressing the issue of GM hybrids for which there was no price premium, the district court stated that "plaintiffs allege that only the 'premium' portion of the seed product is the result of the price-fixing scheme, but the germplasm component of the seed cannot be segregated from the rest of the seed. The evidence demonstrated that defendants and their distributors often lowered the 'overall' price of certain seeds ...." J.A. at 73. Appellants appear to understand this language as a holding that a Clayton Act price-fixing claim is not suitable for class adjudication if the alleged price inflation of the final product derives from an inflated price of a part of the product. Appellees agree that the district court held in this passage that "two-part pricing" in this case precludes common proof of impact. While the meaning of the district court's language here is not entirely clear, we think the court's point was simply that purchasers of some GM hybrids paid no more than they would have paid for corre-

sponding non-GM seeds. The district court did not rely on "two-part pricing," and as appellants note, as a general matter two-part pricing (unlike indirect purchasing) presents no insuperable obstacle to common proof of impact. See, e.g., In re Linerboard Antitrust Litig., 305 F.3d at 158–160. Nor did the district court indicate that the factual setting of this case is such that pegging the alleged price inflation of GM seeds to Monsanto's desire to extract monopoly profits from its patented genes somehow complicates appellants' task of proving classwide injury.

8. For purposes of analyzing appellants' ability to prove classwide injury with common evidence, we assume the existence of conspiracy. In referring to appellees' performance of the conspiracy, we assume that the fact-finder would credit appellants' evidence of that performance. We do not, of course, assume the ultimate truth of any of appellants' allegations.

Appellants argue on appeal that the district court improperly resolved disputes between the parties' experts that go to the merits of the case. We have stated that in ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case. This extends to the resolution of expert disputes concerning the import of evidence concerning the factual setting—such as economic evidence as to business operations or market transactions. While the district court's language may have been overbroad in places, we believe the district court's findings as to the experts' disputes were properly limited to whether, if appellants' basic allegations were true, common evidence could suffice, given the factual setting of the case, to show classwide injury.[9]

Appellants' expert trained his analysis on the overall picture, showing that common evidence could establish that appellees maintained an inflated average price for GM seeds. In doing so, he explained how wide price variation could be consistent with the faithful implementation of a price-fixing conspiracy. He did not demonstrate, though, as he needed to, that class members could use common evidence to show inflation through the whole range of list prices.

█ The expert suggested five potential benchmarks for measuring damages, which appellants argue could be used also to prove injury. By estimating a competitive price against which to compare the actual price, such a benchmark would be useful also to prove the fact of injury. While appellants correctly state that they are not required to settle on any particular benchmark for measuring damages at the class-certification stage, *see In re Liner-*

*board Antitrust Litig.*, 305 F.3d at 154–55, if they propose to use such a method to prove injury, they must show that it could work to prove classwide injury with common evidence. Appellants' expert, in opining on the utility of these benchmarks, did not demonstrate how they could prove inflation through the whole range of list prices for GM seeds.

## VI. Conclusion

The district court found "that individualized issues predominate over common questions and preclude class certification." The question of predomination of individual issues on common questions of damages to the farmers, class members, may be a close issue, but we cannot say the trial court abused its discretion in denying class certification. Accordingly, we affirm.

MORRIS SHEPPARD ARNOLD, Circuit Judge, concurring.

I concur in the result.

---

9. Appellants' impression that the district court resolved merits disputes appears to stem in part from the way the certification issue was argued to the district court—by appellees' experts occasionally intermingling, improperly, opinions on the actual merits of the injury element with opinions on the nature of the evidence that would be required to prove injury, if the alleged conspiracy in fact existed.