# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2843

_____

| | | |
|---|---|---|
| Jacqueline Avritt and Alan Avritt, | * | |
| on behalf of themselves and all | * | |
| others similarly situated, | * | |
| | * | |
| Appellants, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Minnesota. |
| | * | |
| Reliastar Life Insurance Company, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: May 11, 2010
Filed: August 12, 2010

_____

Before WOLLMAN, SMITH, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Jacqueline and Alan Avritt appeal from the district court's[1] order denying class certification for a group of California residents who purchased fixed deferred retirement annuities from Northern Life Insurance Company (Northern)[2] between

---

[1] The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[2] Northern was a Washington corporation that in 2002 merged with Reliastar Life Insurance Company, which is based in Minneapolis, Minnesota. Pursuant to the

1992 and 2002. The Avritts maintain that Northern engaged in unfair and deceptive interest-crediting practices by systematically crediting higher interest to the most recent deposits in its customers' annuity accounts and crediting lower interest to older deposits. The district court determined that class certification was not appropriate because the plaintiffs' claims involved a number of individual issues that could not be resolved on a class-wide basis, including whether Northern misled the plaintiffs about its interest-crediting practices and whether the plaintiffs relied upon any such misrepresentations. Because we conclude that the district court did not abuse its discretion in refusing to certify the class, we affirm.

## I. Factual Background

Fixed deferred annuities are investment products that allow individuals to make deposits into an account for a given period of time, earn interest on the accruing balance, and later receive regular payments based on the money that has accumulated in the account. The policies are structured so that the annuitant receives a guaranteed minimum interest rate and the company issuing the policy retains discretion to credit interest above that rate. The annuities present a tax advantage in that the money invested is not taxed as income until it is withdrawn. Because of the tax advantage and relative safety of the investment, some individuals use fixed deferred annuities to augment their retirement savings.

The Avritts are California residents who purchased fixed deferred annuities from Northern. The gravamen of their complaint is that Northern engaged in a misleading rate-setting practice, wherein the interest that it credited on recent deposits was consistently higher than that which it credited on older deposits. They essentially allege a bait-and-switch scheme which encouraged individuals to purchase Northern's

_____

terms of the merger, Reliastar assumed Northern's liabilities and is therefore the named defendant in this lawsuit. Throughout the opinion we refer to each entity as appropriate to the context.

annuities based on the false assumption that the initial, favorable interest rate would be maintained over time.  They also argue that Northern breached its contract by failing to credit interest in the manner indicated in its policies.

## A. Northern's Interest-Crediting Method

The relevant language in the annuity policies at issue here read as follows:

We guarantee an effective yearly interest rate of three percent (3%).

From time to time, interest greater than the guaranteed rate may be credited in a way set by our Board of Directors.  There may be more than one interest rate in effect at any time.

The contracts also included two hypothetical illustrations that assume the annuitant will receive only the minimum three percent interest.

Northern obtained its profit by maintaining a spread between the interest that it earned on the money invested in its annuities and the interest, above the guaranteed minimum, that it paid to its policyholders.  Northern's method of establishing the spread involved distinguishing between recent deposits and older deposits.  For newer deposits, the spread between what Northern made on its investments and what it paid to a policyholder was typically 1% to 1.25% narrower—in other words, Northern made less profit.

One way to understand this practice is to consider that each new deposit is initially credited at an introductory rate and earns higher interest.  Over time, however, the introductory rate is eliminated so that the interest paid on the deposit reflects the average spread differential targeted by Northern.  The underlying practice at issue here—that of paying a higher introductory rate on more recent deposits—is common throughout the industry, and annuity buyers' guides caution against purchasing an

annuity based solely on its introductory rate. The plaintiffs' own expert testified that there are plenty of companies that initially credit higher interest on deposits than they can afford long-term, and "[i]f the policyholder knows that going in, that's fine." Rather, as the plaintiffs' expert sees it, the problem is whether there is "full disclosure." The record suggests that Northern had some concern about its obligation to disclose its interest-crediting method to its customers, noting in a 1995 internal memo that "[o]ur current approach of saying nothing is not acceptable in the long run."

Northern's annuities were marketed by a sales force that included thousands of independent insurance agents who were aware of the various interest rates that Northern credited on deposits. These agents were not required to follow any particular sales script when they sold Northern's annuities and were free to answer any questions that customers had about the product. Although the 1995 internal memo suggests that the sales agents initially may not have known that the different interest rates reflected Northern's practice of offering higher rates on more recent deposits, Northern's Vice President of Sales, Steve Barron, testified that the practice was disclosed in sales meetings at some point. Baron also testified that the sales agents were told that they might want to consider discussing Northern's interest-crediting methods with customers. Brad Corbin, who began as an independent agent with Northern in 1992 and eventually became head of the company's sales department, testified that in discussions with customers, sales agents would sometimes compare Northern's approach of subsidizing new money rates to another company's use of an explicit first year bonus. According to Corbin, prospective customers would frequently ask about bonuses, and sales agents would explain that Northern's implicit bonus was advantageous because it was eliminated over a longer period of time.

There is some evidence that Northern's interest-crediting practice was inadequately disclosed in the mandatory filings that the company was required to submit to regulatory agencies. Northern was obligated to inform state regulators of

-4-

the method through which it determined the non-guaranteed interest payable to its policyholders. According to the plaintiffs' experts, Northern inaccurately characterized its interest-crediting method as being entirely dependent on the performance of the underlying investments, omitting the fact that it lowered interest rates on old funds to recoup its initial subsidy of newer deposits. In 2005, state regulators began an investigation of Northern's interest-crediting practices, but no final determination has yet been made about the legality of the company's conduct.

## B. The Avritts' Annuity Purchases

Alan Avritt purchased his annuity in 1992 with the help of a financial advisor. He did not receive any sales materials from Northern and he did not compare Northern's interest rates with those of other annuity providers or the market in general. The financial advisor who spoke with Alan Avritt told him that Northern was a good company and that the annuity would provide a good rate of return. Alan Avritt did not undertake any independent investigation before making the decision to purchase the product. After his purchase, he made monthly deposits into the annuity for the next fourteen years.

The interest that Northern paid on Alan Avritt's deposits varied over the life of the policy but was at all times greater than three percent, often ranging between five and six percent. From 1992 until 1997, Alan Avritt received account statements indicating the interest that was being credited to his account. The statements showed that he was receiving different interest rates on recent deposits than he was on older deposits, with deposits made during the current year generally credited a higher rate than those made in previous years. The reason for the difference, however, was not explained. Beginning in 1997, Northern changed the format of its account statements so that the different rates were not apparent to policyholders.

Jacqueline Avritt periodically reviewed Alan Avritt's account statements to see how the investment was performing. In 1999, she purchased her own fixed deferred annuity from Northern through a financial advisor. She did not receive any brochures or sales materials and did not compare Northern's interest rates with those of other annuity providers. Jacqueline Avritt could not remember the interest rate quoted to her at the time of her purchase but remembered thinking that it was good, and she believed her financial advisor's advice that Northern would pay a good rate. Following her purchase of the annuity, Jacqueline Avritt made monthly deposits for a number of years. The interest credited to her deposits varied but was at all times greater than the guaranteed minimum of three percent.

## C. Procedural History

The Avritts sued Reliastar in 2006, alleging, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, violation of the Washington Consumer Protection Act, and violation of the California Unfair Competition Law. After denying Reliastar's motion to dismiss, the district court considered the Avritts' motion for class certification. The district court assumed without deciding that the Avritts could satisfy the initial requirements for class certification in Federal Rule of Civil Procedure 23(a). The district court, however, rejected the Avritts' contention that they could satisfy the additional requirements in Rule 23(b)(2) or 23(b)(3). The court concluded that the Avritts' focus on monetary damages precluded Rule 23(b)(2) certification on the basis that injunctive or declaratory relief was appropriate to the class as a whole. It then considered the nature of each of the Avritts' claims and determined that they had failed to establish that common questions predominated over individual issues, as required for certification under Rule 23(b)(3). In particular, the court found that the express terms of the annuity contract did not obligate Northern to credit non-guaranteed interest in any particular manner and that establishing Reliastar's liability would thus require evidence of how its product was marketed to each purchaser.

After class certification was denied, the Avritts conceded that they could not meet the amount in controversy requirement to sustain diversity jurisdiction, whereupon the district court dismissed the case for lack of subject matter jurisdiction.

## II. Analysis

We review a district court's denial of class certification for abuse of discretion. Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1145 (8th Cir. 1999). Federal Rule of Civil Procedure 23(a) sets out four threshold requirements that must be met before a plaintiff may file a lawsuit on behalf of a class of persons. Once those prerequisites have been met, the plaintiff must also establish that the class fits within one of three types of class actions listed in Rule 23(b). Like the district court, we will assume that the Avritts could satisfy the prerequisites of Rule 23(a) and will focus our attention on their arguments that the class should be certified under Rule 23(b)(2) or 23(b)(3).

### A. Rule 23(b)(3)'s Requirement of Common Questions of Law or Fact

Under Rule 23(b)(3), the district court may certify a class action if it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence. See Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005). "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." Id. "If the same evidence will suffice for each member to make

a prima facie showing, then it becomes a common question." Id. In making its determination, the district court must undertake a "rigorous analysis" that includes examination of what the parties would be required to prove at trial. See Elizabeth M. v. Montenez, 458 F.3d 779, 786 (8th Cir. 2006). The court may also be called upon to "resolve disputes concerning the factual setting of the case." Blades, 400 F.3d at 575. As explained below, we conclude that the district court did not abuse its discretion in finding that the Avritts' theories of liability could not be supported solely with reference to class-wide proof.[3]

1. Breach of Contract

The Avritts first claim that Northern breached the express terms of its annuity contracts by failing to adhere to its promise to credit non-guaranteed interest "in a way set by our Board of Directors." The Avritts argue that Northern violated this contractual language in two respects: first, by failing to credit non-guaranteed interest in a single "way" and instead treating newer deposits differently than older deposits; and second, by failing to have its board of directors "set" the way that non-guaranteed interest would be credited. In support of the latter argument, the Avritts cite portions of the record in which a witness for Northern testified that the board reviewed and approved interest rate recommendations made by the company's actuaries. The Avritts apparently conclude that this description of the board's actions does not amount to "setting" the interest rate. They further contend that Northern's express breach of contract establishes its liability to the entire class, and they fault the district court for giving their breach of contract claims minimal consideration in its order denying class certification.

---

[3]The district court determined that Washington law applied to the Avritts' common law claims, and neither party has challenged the court's finding on appeal.

The district court's skepticism toward the Avritts' breach of contract claims was well founded. As an initial matter, it is not clear that any members of the putative class, let alone a substantial number of them, originally understood the contract language in the manner that the Avritts now propose. The record indicates that the Avritts themselves attached little significance to the phrase at issue. Their current interpretation of Northern's obligation to credit non-guaranteed interest "in a way set by our Board of Directors" is at least subject to reasonable dispute. One reasonable reading of that language is simply that Northern retained discretion over how it credited non-guaranteed interest, not that it was required to use a single, uniform formula for calculating all interest payments. Indeed, the very next sentence in the contract notifies purchasers that "[t]here may be more than one interest rate in effect at any time." It is likewise unclear that the contract dictated any particular role for the board of directors other than to ratify the company's interest crediting method in some manner.

Assuming that the Avritts' interpretation of the contract is plausible, however, the existence of two or more reasonable interpretations opens the door for extrinsic evidence about what each party intended when it entered the contract. See Brogan & Anensen LLC v. Lamphiear, 202 P.3d 960, 961-62 (Wash. 2009) (per curiam) (holding that extrinsic evidence is admissible to determine the contracting parties' intent with respect to ambiguous contract terms); see also Schnall v. AT & T Wireless Servs., Inc., 225 P.3d 929, 937 (Wash. 2010) (observing that Washington courts permit the introduction of extrinsic evidence to interpret standardized contracts).[4] In

[4]In support of their contention that extrinsic evidence of individual intent would be irrelevant to their express breach of contract claims, the Avritts cite several cases holding that Washington courts follow the objective manifestation theory of contracts. The Avritts' argument, however, improperly conflates the distinct concepts of subjective intent and extrinsic evidence. "The objective manifestation theory of contracts . . . lays stress on the outward manifestation of assent made by each party to the other" and accordingly imputes to each party "an intention corresponding to the reasonable meaning of a person's words and acts." City of Everett v. Estate of

addition to extrinsic evidence about Northern's intent, Reliastar would be entitled to introduce evidence about how the contract was explained in various sales discussions and whether each purchaser's understanding of the contract was consistent with the theory the Avritts now advance. Thus, Reliastar's liability to the entire class for breach of contract cannot be established with common evidence.

As the district court recognized, an additional problem with the Avritts' breach of contract claim is the relationship between the alleged breach and the Avritts' theory of damages. The court determined that the Avritts' articulation of damages rested upon their belief that Northern should have adopted a particular approach to crediting interest—for example, maintaining the initial, higher interest rate for all deposits. Even if the Avritts' interpretation of the contract language is correct, however, it does not follow that Northern was contractually obligated to credit interest in the manner that they have suggested. The Avritts insist that Northern's board was required to set interest in a single way for all deposits. But according to this interpretation, the board still retained discretion to fix the interest rate for all funds at three percent or slightly above, which would have actually been significantly lower than the rate that the Avritts received. To establish any damages, the Avritts must additionally allege either a duty not expressly delineated in the terms of the contract or some type of misrepresentation upon which they relied. The district court thus properly concluded that the true focus of the contract claims was not on the policy language itself but on the Avritts' allegation of an implied duty for Northern to act honestly and fairly in establishing its rates.

Accordingly, the district court did not abuse its discretion in holding that the Avritts were not entitled to class certification on their breach of contract claims.

_____

Sumstad, 631 P.2d 366, 367 (Wash. 1981). This principle establishes the standard by which evidence of intent is analyzed; it does not prevent a court from using extrinsic evidence to interpret an ambiguous contract, a practice endorsed in myriad Washington contract cases.

## 2. Implied Covenant Claims

The Avritts next contend that Northern's interest-crediting practices breached the implied covenant of good faith and fair dealing and that the breach can be established with evidence common to the entire class. They argue that although Northern may have had discretion in determining how to credit non-guaranteed interest, it was obligated to exercise that discretion honestly and fairly. The Avritts maintain that Northern breached its duty by setting rates in a manner that discriminated against older customers and misled prospective purchasers about the nature of the product.

"All parties to a contract have duties of good faith and fair dealing." City of Woodinville v. Northshore United Church of Christ, 211 P.3d 406, 412 (Wash. 2009). The duty of good faith and fair dealing, however, "arises only in connection with terms agreed to by the parties," and therefore does not create "a free-floating duty of good faith unattached to the underlying legal document." Badgett v. Security State Bank, 807 P.2d 356, 360 (Wash. 1991). Applying these principles, the district court correctly determined that evidence of the representations made to each purchaser and the understanding that they attached to the contract would be essential to establishing liability.

As discussed above, the contract itself does not expressly guarantee any amount of interest above the three percent minimum. Whether Northern acted in bad faith by emphasizing its non-guaranteed interest rate for new deposits and encouraging purchasers to believe that the introductory rate was indicative of future rates is a question closely tied to the circumstances of each individual plaintiff. If, for example, a prospective purchaser had discussed the issue of bonuses with a sales agent and had heard about Northern's implicit bonus structure, the subsequent use of that practice could hardly be considered bad faith with respect to that purchaser. Liability might similarly be precluded in a scenario in which Northern had made no representations

-11-

about its rates other than what appeared in the contract, and a purchaser like Jacqueline Avritt bought an annuity with full knowledge of the rates that Northern had credited over an extended period of time. As we explained in our discussion of the Avritts' breach of contract claims, analyzing contractual duties arising from an ambiguous document would likely require extrinsic evidence about the individual intent of each policyholder.

The Avritts cite several cases for the proposition that the extent of the duty of good faith and fair dealing is defined by objectively reasonable conduct, but their argument misses the point that what is objectively reasonable depends on the nature and context of the parties' bargain. For this reason, we are unpersuaded by the holding of the Washington Court of Appeals in Curtis v. Northern Life Insurance Co., No. 61372-3-I, 2008 WL 4927365 (Wash. Ct. App. Nov. 17, 2008) (unpublished), a parallel class action in Washington state court. The Curtis court held that a class action could be certified on the plaintiffs' identical claim that Northern breached its duty of good faith and fair dealing, based on common evidence that Northern failed adequately to disclose its interest-crediting practices in its regulatory filings. This holding conflicts with established Washington law that identifies the contract itself as the source of the duty. See Badgett, 807 P.2d at 361 ("The duty of good faith implied in every contract does not exist apart from the terms of the agreement."). Although Northern's compliance with regulatory requirements might be relevant to the issue of whether the company's conduct was objectively reasonable, the analysis of Northern's good faith duties cannot be divorced from the underlying contract and the company's relationship with each purchaser. The district court properly concluded that evidence of the parties' justified expectations would be required to establish a breach of the duty of good faith and fair dealing. And those expectations are likely to vary among members of the putative class based on, among other things, each purchaser's individual interaction with sales agents. Thus, the court did not abuse its discretion

-12-

in determining that common questions did not predominate with respect to the plaintiffs' implied covenant claims and refusing to certify a class on this issue.[5]

### 3. Washington's Consumer Protection Act

The district court also denied certification for the Avritts' claim that Northern's actions violated the Washington Consumer Protection Act (WCPA), Wash. Rev. Code Ann. § 19.86.020, which declares unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." We conclude that the Avritts' WCPA arguments are foreclosed by the Washington Supreme Court's recent holding in Schnall v. AT & T Wireless Services, Inc., 225 P.3d 929 (Wash. 2010), a case that was decided while the present case was on appeal.

In Schnall, the Washington Supreme Court considered the extraterritorial application of the WCPA and determined that "[t]o state a [WCPA] claim a person must show that the unfair or deceptive act affected the people of the state of Washington." Id. at 938. The court explained that WCPA actions, whether they are pursued by the Washington Attorney General or a private citizen, may be brought only on behalf of persons residing within the state. Id. at 938-39. The court's analysis was unaltered by the fact that the defendant corporation was based in Washington and engaged in the disputed transactions within the state. See id. at 944-45 (Sanders, J., dissenting) (observing that the defendant was a Washington corporation and that "[s]ignificant portions of each transaction occurred in Washington").

---

[5]Although the Avritts also raised a related claim of unjust enrichment, they have acknowledged that this claim rests on the same basis as their other common law claims. For the same reasons that we conclude that the district court did not abuse its discretion in refusing to certify a class on those claims, we conclude that the district court did not abuse its discretion in refusing to certify the Avritts' unjust enrichment claim.

-13-

The Avritts seek certification for a class of California residents who were allegedly injured by the activities of a company that was then based in Washington. Schnall makes clear that a WCPA claim cannot succeed in this context. Accordingly, the district court did not abuse its discretion in denying class certification on this claim. See Irving v. Dormire, 586 F.3d 645, 647 (8th Cir. 2009) (noting that we may affirm the district court's rulings on any basis supported by the record).

4. California's Unfair Competition Law

The Avritts contend that the district court abused its discretion in refusing to certify a class action based upon violations of California's Unfair Competition Law (UCL), which prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The UCL is a broad statute that empowers California citizens to act as private attorneys general and seek restitution from businesses that engage in a wide range of improper or illegal activities. See id. § 17204. As originally drafted, the UCL did not limit the filing of such lawsuits to individuals who had actually been harmed by the disputed business practice, and consequently the law became a font for abusive litigation. See In re Tobacco II Cases (Tobacco II), 207 P.3d 20, 31-32 (Cal. 2009). In order to curb the filing of frivolous lawsuits, the UCL was amended by ballot measure in 2004, and the statute now provides that a litigant has standing to file a lawsuit only if he or she has suffered injury as a result of the disputed business practice. See id. at 25-28.

The California Supreme Court recently considered the 2004 amendment and held that the new statutory standing requirement applies solely to the class representatives and not to all other class members. Id. at 25. In reaching its conclusion, the court noted that prior to the 2004 amendment, California courts had "repeatedly and consistently [held] that relief under the UCL is available without individualized proof of deception, reliance, and injury." Id. at 35. The Avritts argue that they are entitled to class certification on their UCL claim because they can

establish that Northern's interest-crediting practice was unlawful, unfair, or fraudulent, and they maintain that in light of Tobacco II they are not required to produce evidence of individual class members' reliance or injury.

We are unpersuaded, however, for several reasons. As an initial matter, it is not clear that the California Supreme Court's discussion of standing in Tobacco II was meant to have any bearing on whether a plaintiff can satisfy the class certification requirement that common questions of law or fact predominate. The California Court of Appeals has interpreted Tobacco II as narrowly limited to the question of standing, concluding that "[w]e see no language in Tobacco II which suggests to us that the [California] Supreme Court intended our state's trial courts to dispatch with an examination of commonality when addressing a motion for class certification." Cohen v. DirectTV, Inc., 101 Cal. Rptr. 3d 37, 49 (Cal. Ct. App. 2009), review denied (Feb. 10, 2010). Cohen went on to hold that the trial court properly refused to certify a UCL claim where individual questions about each putative class member's reliance on allegedly false representations would eliminate commonality and make class adjudication unmanageable. See id. But see In re Steroid Hormone Prod. Cases, 104 Cal. Rptr. 3d 329, 340 (Cal Ct. App. 2010), review denied (Apr. 14, 2010) (observing that Cohen may be inconsistent with Tobacco II). Although the state of California's UCL jurisprudence is currently uncertain, there is reason to doubt that the holding in Tobacco II goes as far as the Avritts suggest, eliminating any need to show that unnamed class members relied on any misrepresentations or were actually injured.

Moreover, to the extent that Tobacco II holds that a single injured plaintiff may bring a class action on behalf of a group of individuals who may not have had a cause of action themselves, it is inconsistent with the doctrine of standing as applied by federal courts. The "irreducible constitutional minimum of standing requires a showing of injury in fact to the plaintiff that is fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009) (internal quotations and alteration

omitted). The constitutional requirement of standing is equally applicable to class actions. Sutton v. St. Jude Med. S.C., Inc., 419 F.3d 568, 570 (6th Cir. 2005). Although federal courts "do not require that each member of a class submit evidence of personal standing," a class cannot be certified if it contains members who lack standing. Denney v. Deutsche Bank AG, 443 F.3d 253, 263-64 (2d Cir. 2006). A class "must therefore be defined in such a way that anyone within it would have standing." Id. at 264. Or, to put it another way, a named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves.

As we noted earlier, prior to its amendment in 2004, the UCL allowed an uninjured plaintiff to bring a lawsuit in the California courts as a private attorney general. The mere existence of a state cause of action, however, did not provide the plaintiff with standing to bring a lawsuit in federal court. See Lee v. Am. Nat'l Ins. Co., 260 F.3d 997, 1001-02 (9th Cir. 2001) (holding that an uninjured plaintiff who may have had a state cause of action under the UCL was "foreclosed from litigating the same cause of action in federal court, [because] he cannot demonstrate the requisite injury"); see also Nike, Inc. v. Kasky, 539 U.S. 654, 661-62 (2003) (Stevens, J., concurring in dismissal of certiorari as improvidently granted) (observing that an uninjured plaintiff lacked Article III standing to bring his UCL claim in federal court). Under the California Supreme Court's recent interpretation of the 2004 UCL amendment, uninjured plaintiffs may be permitted to join a class action in state court, provided that a lone representative has satisfied the statutory standing requirement articulated in Tobacco II. But as the Tobacco II dissent pointed out, the court's expression of the UCL's standing requirement diverged from federal jurisprudential principles, see id. at 42-44 (Baxter, J., dissenting), which we are bound to follow.

Finally, as the Avritts concede, even if it were not necessary to consider individual evidence of the plaintiffs' reliance and injury, a UCL claim cannot succeed without common evidence of misconduct. Thus, to the extent that individual evidence is necessary to show that Northern's practices were actually unlawful, unfair, or

fraudulent, class certification is inappropriate.  The district court concluded that whatever prong of the UCL the Avritts based their claims upon, the allegedly wrongful conduct primarily involved deception, misrepresentation, and false regulatory filings.  The district court determined that issues of individual reliance would therefore be relevant to establishing liability.  We agree.

The record indicates that Northern did not adopt a uniform approach with respect to its representation of its interest-crediting policies.  As detailed above, Northern's annuities were sold by thousands of independent agents who did not follow a particular sales script when working with customers.  All of the agents were aware of the various interest rates that Northern credited for both newer and older deposits, and the record suggests that at least some of the agents knew that the different rates reflected the company's practice of crediting higher interest to newer deposits.  Sales agents were also free to answer any questions that customers had about the product.

Further, the experience and sophistication of Northern's customers varied, as illustrated by the differences between the transactions of the two named plaintiffs in this case.  Alan Avritt purchased his annuity without investigating the product and with little idea of what interest rate he would receive.  Jacqueline Avritt, in contrast, purchased her annuity after years of reviewing her husband's policy statements and tracking the performance of the investment.  Given the varying experiences of each of the members of the putative class, it is unlikely that any misconduct could be uniformly established as to all purchasers.  Accordingly, the district court did not abuse its discretion in denying class certification on the Avritts' UCL claim.[6]

---

[6]Because we conclude that the district court did not abuse its discretion in determining that common questions of law and fact did not predominate with respect to all of the Avritts' claims, we need not review the court's additional determination that a class action would not be a superior method of adjudicating the controversy.

## B. Rule 23(b)(2) and Injunctive or Declaratory Relief

The Avritts alternatively argue that even if class certification was inappropriate under Rule 23(b)(3), the district court abused its discretion by failing to certify the class under Rule 23(b)(2). Rule 23(b)(2) provides that a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The Avritts contend that their claims are based on actions that Northern took that affected the entire class. They argue that because injunctive or declaratory relief concerning Northern's interest-crediting practices would be appropriate as to all putative class members, the district court should have certified the class under Rule 23(b)(2).

"Class certification under Rule 23(b)(2) is proper only when the primary relief sought is declaratory or injunctive." In re St. Jude Med., Inc., 425 F.3d 1116, 1121 (8th Cir. 2005). Although Rule 23(b)(2) does not refer to the predominance of common questions, "class claims thereunder still must be cohesive." Id. Indeed, cohesiveness is even more important for a Rule 23(b)(2) class because, unlike Rule 23(b)(3), there is no provision for unnamed class members to opt out of the litigation. Id. Individuals comprising a Rule 23(b)(2) class are therefore "generally bound together through preexisting or continuing legal relationships or by some significant common trait such as race or gender." Id. at 1122 (quoting Holmes v. Cont'l Can Co., 706 F.2d 1144, 1155 n.8 (11th Cir. 1983)).

We conclude that the district court did not abuse its discretion in denying certification under Rule 23(b)(2). As the district court pointed out in its order denying class certification, plaintiffs' counsel conceded that the case was primarily about money damages, not injunctive relief. The Avritts seek to recover money that they would have been paid if Northern had credited interest to their annuity accounts as they thought proper. Nevertheless, they contend that certification under Rule 23(b)(2)

is appropriate because they also seek a declaration that Northern's interest-crediting practices were improper and injunctive relief requiring Reliastar to use the same factors in crediting interest to both new and old deposits. As we have explained, however, Northern's conduct cannot be evaluated without reference to the individual circumstances of each plaintiff. Although the Avritts seek to frame their claims as solely involving questions about the propriety of Northern's interest-crediting practices, this case is fundamentally about the plaintiffs' allegations of non-disclosure and deception. The plaintiffs' own expert admitted as much when he testified that the practice at issue would be unremarkable if it were fully disclosed.

The fact that the level of disclosure—as well as the extent of each individual's reliance—varied between plaintiffs makes this an inappropriate case for injunctive or declaratory relief. It also distinguishes this case from other cases that the Avritts cite to support certification under Rule 23(b)(2) when a plaintiff seeks injunctive or declaratory relief as a precursor to money damages. In DeBoer v. Mellon Mortgage Co., for example, we approved a class action settlement pursuant to Rule 23(b)(2) where the plaintiffs were mortgagees seeking to enjoin a mortgage servicer from requiring them to maintain unreasonably high balances in an escrow account. 64 F.3d 1171, 1175 (8th Cir. 1995). The practice at issue in DeBoer essentially allowed the mortgage servicer to "receive[] an interest-free loan from the customer on the excess amount" held in the escrow account. Id. at 1173. We held that certification was appropriate under Rule 23(b)(2) because the class sought an injunction prohibiting the over-escrowing practice, and we observed that our analysis was unchanged by the fact that the class also incidentally sought money damages. Id. at 1175. In DeBoer, however, the mortgage servicer's liability to the class turned on a single question that uniformly applied to all class members: whether the mortgage servicer was required to use aggregate or individual-item accounting in determining the amount of money to hold in an escrow account. See id. at 1173. Resolution of that question as to one of the plaintiffs necessarily resolved the issue for the entire class. Class cohesiveness

and the possibility of uniform resolution of the plaintiffs' claims therefore justified certification under Rule 23(b)(2).

The Seventh Circuit reached a similar conclusion in a case involving former employees challenging their company's administration of a retirement benefit plan. See Berger v. Xerox Ret. Income Guar. Plan, 338 F.3d 755 (7th Cir. 2003). The plaintiffs sought "a declaration that Xerox's method of computing the lump sums to which withdrawing employees are entitled is unlawful." Id. at 763. Resolution of the plaintiffs' claims required the court to determine only which of two methods of computing lump sum payments was proper, a determination that necessarily applied to all members of the class. See id. at 759-60. The court held that the plaintiffs' pursuit of a declaratory judgment made class certification under Rule 23(b)(2) appropriate, notwithstanding the fact that the plaintiffs also sought money damages. As the court explained, "[t]he declaration established the right of each of the class members, and the computation of the damages due each followed mechanically." Id. at 764. Thus, as in DeBoer, the central issue in Berger was one that could be decided uniformly with respect to all plaintiffs.

Because the claims of the putative class members in this case are not susceptible to uniform resolution, Berger and DeBoer are inapposite. The district court properly recognized that resolution of the plaintiffs' claims would require numerous individual determinations regarding Northern's representations and each purchaser's reliance, and that the class was therefore not cohesive enough to satisfy Rule 23(b)(2). Accordingly, the district court did not abuse its discretion in denying class certification under that rule.

### III. Conclusion

The judgment is affirmed.

_____