[No. B204986. Second Dist., Div. Eight. Sept. 28, 2009.]

PHILIP KENT COHEN, Plaintiff and Appellant, v.
DIRECTV, INC., Defendant and Respondent.

COUNSEL

King & Ferlauto, William T. King and Thomas M. Ferlauto for Plaintiff and Appellant.

Kirkland & Ellis, Melissa D. Ingalls, Becca Wahlquist and Shaun Paisley for Defendant and Respondent.

OPINION

**BIGELOW, J.**—A subscriber to services delivered by a satellite television company filed a class action complaint alleging the company had disseminated false advertising to induce him and other subscribers to purchase more expensive "high definition" or "HD" services. On a prior appeal, we affirmed

the trial court's order denying the company's motion to compel arbitration of the subscribers' class action claims. (See *Cohen v. DIRECTV, Inc.* (2006) 142 Cal.App.4th 1442 [48 Cal.Rptr.3d 813] (*Cohen I*).) In the appeal before us today, the subscribers challenge the trial court's subsequent order denying their motion for class certification. We affirm the trial court's order.

## FACTS

DIRECTV, Inc., operates a satellite system that transmits television programming to subscribers for a monthly fee. In February 1997, Philip Kent Cohen began subscribing to DIRECTV's basic service. In July 2003, Cohen upgraded to DIRECTV's "HD Package," which, according to the company's advertising, delivers higher quality television images than its basic service.[1] Subscribers to the HD Package pay an additional monthly fee, and must buy equipment costing, in some instances, more than $1,000. (See *Cohen I, supra,* 142 Cal.App.4th at p. 1445.)

In November 2004, Cohen filed a class action complaint against DIRECTV on behalf of himself and "similarly situated consumers" and "the general public." Cohen's operative complaint alleges two causes of action: (1) violation of the Consumers Legal Remedies Act or "CLRA" (see Civ. Code, § 1750 et seq.), and (2) violation of the unfair competition law or "UCL" (see Bus. & Prof. Code, § 17200). Broadly summarized, Cohen's complaint rests on the following foundational claim: "Starting in September of 2004, DIRECTV started tinkering with the HDTV channels making up the HD Package in an effort to preserve bandwidth." More specifically, Cohen alleges that DIRECTV reduced the bandwidth of transmission from "19.4 Mbps" or millions of bits per second or megabits per second, to "an astonishing 6.6 Mbps," and also reduced the "horizontal and interlaced vertical lines" on certain channels. In more colloquial terms, Cohen's complaint alleges that DIRECTV switched its HD channels to a lower "resolution," reducing the quality of the television images it transmits to its subscribers.

Cohen's complaint does not allege that DIRECTV is systematically breaching its subscribers' contracts for satellite television services by transmitting a lower resolution television image than it is contract-bound to deliver. Instead, Cohen alleges a species of fraud in the inducement, alleging that subscribers to DIRECTV's HD services purchased those services in reliance on the company's false advertising. In that vein, Cohen alleges that he and the other

---

[1] According to Cohen, he subscribes to DIRECTV's HD service because he likes watching the company's exclusive NFL Sunday Ticket programming in HD.

class members "subscribed to DIRECTV's HD Package based upon DIRECTV's national advertising and marketing of the HD Package"; and that DIRECTV has "represented that channels in its HD Package are broadcasted in the . . . 1920x1080i standard and at 19.4 Mbps, which they are not," and that DIRECTV has "advertised the sale of its HD Package without the intent to provide the customers with broadcasts in the . . . 1920x1080i standard and at 19.4 Mbps."

In May 2005, DIRECTV filed a motion to compel arbitration. Cohen opposed the motion, arguing the arbitration clause found in the parties' customer agreement was not enforceable because (1) DIRECTV's unilateral addition of an arbitration clause did not result in a binding agreement to arbitrate, and (2) the ban on class litigation of claims in arbitration was unconscionable. The trial court denied DIRECTV's motion, concluding the arbitration clause was " 'procedurally and substantively unconscionable, against public policy and unenforceable.' " (*Cohen I, supra,* 142 Cal.App.4th at p. 1446.) In September 2006, we affirmed the trial court's decision to deny the motion to compel arbitration.[2] (142 Cal.App.4th at p. 1442.)

In October 2007, Cohen filed a motion for class certification and appointment of class counsel. Cohen's motion to certify the class was supported in significant part with evidence showing DIRECTV's print advertising and promotional materials for its HD Package, and requested the trial court to certify a class defined as follows: "Residents of the United States of America who subscribed to DIRECTV's High Definition Programming Package."

DIRECTV's opposition to the motion for class certification was supported in large part by a number of declarations from subscribers to the company's HD Package, each of whom explained that his or her individual decision to buy the upgraded service had not been precipitated by any printed advertising or other promotional materials disseminated by DIRECTV.[3]

---

[2] DIRECTV's motion included a demurrer to Cohen's complaint or, in the alternative, a motion to compel arbitration. The trial court overruled the demurrer at the hearing on the motion to compel arbitration, and, shortly after we issued our September 2006 opinion in *Cohen I, supra,* 142 Cal.App.4th 1442, DIRECTV filed its answer to Cohen's complaint.

[3] A sampling of the declarations submitted by DIRECTV includes the following. Dan Kraus declared: "I decided to subscribe to HD Programming because I bought an HDTV, and [DIRECTV was] finally offering enough high def programming for me to sign up." He did not recall any details of DIRECTV's advertising. Thomas Barbour: "I decided to subscribe to HD Programming because I wanted to see the Bears games in HD and other sports . . . ." He did not remember "anything in that advertising about pixels or bandwidth." Scott Greenwood: "I decided to subscribe . . . because of the better quality channels available." He did not recall seeing any advertising regarding DIRECTV's HD services before subscribing. Katherine Kelso: "I decided to subscribe to HD Programming because my husband wanted it." Gordon Sparks: "I decided to subscribe to HD Programming because I bought two new LCD Sony

On November 8, 2007, the parties argued the motion to certify a class, and the trial court took the matter under submission. On November 15, 2007, the court entered an order denying Cohen's motion for class certification for the following stated reasons:

"[Code of Civil Procedure section] 382 requires the following to maintain a class action: (1) There must be an ascertainable class; and (2) there must be a well-defined community of interest regarding the questions of law and fact affecting the parties to be represented. . . .

"ASCERTAINABILITY

"Ascertainability turns on (1) the class definition; (2) the size of the class; and (3) the means of identifying the class members. [(]*Miller v. Woods* (1983) 148 Cal.App.3d 862, 873 [196 Cal.Rptr. 69].[)] Here, the class members are [defined as] all subscribers to [DIRECTV]'s HD Package. [DIRECTV] has stipulated that it is capable of identifying, by name, telephone number and billing address each potential class member that subscribed to the HD Package or activated an HD receiver.

"The inquiry, however, does not end there. Recent case law [has] made defining a class under the UCL and the C[LR]A much trickier. In *Akkerman v. Mecta Corp.[, Inc.]* (2007) 152 Cal.App.4th 1094 [62 Cal.Rptr.3d 39] the court rejected as overbroad the following class definition: 'All members of the public who have received shock treatment in California from MECTA devices after September of 1997.' The definition was overbroad because it included patients who were not properly members of the class such as those who were not deceived by defendants' alleged misrepresentations, those who relied on representations other than those claimed to be deceptive, and those for whom the treatment was beneficial. The class certification motion failed on ascertainability grounds.

"Here, plaintiff's class suffers from the same flaws because it includes:

"Subscribers who never saw DIRECTV advertisements or representations of any kind

---

televisions and couldn't see HD programming without HD receivers." He did not recall any advertising about pixels or bandwidth. Terry Scott: "I decided to subscribe to HD Programming because I bought a new HD television and wanted to get the programming to match. [¶] . . . Before I subscribed, I personally saw DIRECTV's HD programming at a friend's house and thought the pictures were really clear." Lisa Bowman: "I decided to subscribe to HD Programming because when we got the HDTV, I was a Dish Network subscriber at the time, and I was unhappy. I switched to DIRECTV for a lower price. [¶] . . . Before I subscribed, I personally saw DIRECTV's HD Programming at my parents' house. I thought it looked great." She did not recall any details of DIRECTV's advertising.

"Subscribers who only saw and/or relied upon advertisements that contained no mention whatsoever of technical terms regarding bandwidth or pixels

"Subscribers who purchased DIRECTV HD primarily based on word of mouth or because they saw DIRECTV's HD in a store or at a friend's home

"Subscribers who do not know what 1080i or a pixel is.

"Accordingly, the class definition is overly broad.

"COMMONALITY

"Each putative class member's contract expressly states that it is governed by the state in which the subscriber resides. A nationwide class action would be difficult at best.

"For a nationwide class action, where, as here, the consumers have agreed to apply their own state's laws to the dispute at hand, a court must conduct the choice of law analysis to each class members' home state. [(]*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 914 [103 Cal.Rptr.2d 320, 15 P.3d 1071] [(*Washington Mutual Bank*).)] The choice of law provisions in the contracts with class members exist[] specifically to be fair to consumers who purchase, receive and pay for their DIRECTV programming from their home states and would expect their own state laws to govern. According to [DIRECTV]'s evidence, less than 20% of DIRECTV HD subscribers reside in CA.

"The home state laws have a substantial relationship to their DIRECTV transactions so the parties' choice of law should be enforced. Cohen has not demonstrated that state law variations will not swamp common issues and defeat predominance. [(*Washington Mutual Bank, supra*, 24 Cal.4th at p. 926.)] Additionally, although the arbitration provision in DIRECTV's Customer Agreements with California HD subscribers has been held uncon-[scionable], [DIRECTV] is entitled to seek to enforce its arbitration agreement with subscribers in states where the agreement is enforceable or where the issue is und[et]ermined. Where a state by state analysis of an arbitration provision's enforceability would be required to certify a nationwide class, predominance does not exist and the nationwide class should not be certified. [(]*Lozano v. AT & T Wireless Services, Inc.* [(9th Cir. 2007) 504 F.3d 718.)]

"More to the point, although this case was not cited by [DIRECTV], it is instructive here. In *Norwest Mortgage[, Inc.] v. Superior Court* (1999) 72

Cal.App.4th 214 [85 Cal.Rptr.2d 18] [(*Norwest*)], the court declined to certify a nationwide class for claims under UCL or C[LR]A [for the following reasons:] [']We ordinarily presume the Legislature did not intend the statutes of this state to have force or operation beyond the boundaries of the state. (*North Alaska Salmon Co. v. Pillsbury* (1916) 174 Cal. 1, 4 [162 P. 93]; *People v. One 1953 Ford Victoria* (1957) 48 Cal.2d 595, 598–599 [311 P.2d 480].) Accordingly, we do not construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute. (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1058–1059 [80 Cal.Rptr.2d 828, 968 P.2d 539].)[' (*Norwest*, at p. 222.)]

"The [*Norwest*] court then concluded that the UCL contained no indication that it was intended to be applied to non-California residents with claims arising from conduct that occurred outside of California. The plaintiffs' claims here are UCL claims and C[LR]A claims. Under the *Norwest* decision, a nationwide class cannot be certified under these causes of action.

"Finally, after Proposition 64, the requirements for establishing reliance in UCL class actions are uncertain. First, there is no doubt that per the C[LR]A actual reliance must be established. [([See *Buckland v. Threshold Enterprises, Ltd.* [(2007) 155 Cal.App.4th 798 [66 Cal.Rptr.3d 543]] ('In view of *Caro* [*v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644 [22 Cal.Rptr.2d 419]], plaintiffs asserting CLRA claims sounding in fraud must establish that they actually relied on the relevant representations or omissions.').])] Even pre-Prop. 64 cases only allow inferred reliance where the misrepresentations were common to all class members. An inference of classwide reliance cannot be made where there is no showing that representations were made uniformly to all members of the class. [([*Osborne v. Subaru of America*[*, Inc.*] (1988) 198 Cal.App.3d. 646 [243 Cal.Rptr. 815].])]

"Prior to Prop. 64 the standard for fraud was 'likely to be deceived.' However since Prop. 64, amendments require the plaintiff to have suffered injury in fact and lost money or property. A conclusion may be drawn that class members must have actu[a]lly been deceived.

"Even under a more generous standard, plaintiff has not shown class wide actual reliance or deception, plaintiff here has not demonstrated common misrepresentations but instead has culled out select advertisements that may or may not have been seen by the class members. This is not enough to apply *Vasquez* [*v. Superior Court* (1971) 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964]].

"In light of the above, plaintiff's motion for class certification is denied."

Cohen thereafter filed a timely notice of appeal from what he calls the trial court's "death knell" order.

## DISCUSSION

### I. *Standard of Review*

■ Code of Civil Procedure section 382 authorizes a representative plaintiff to pursue a class action "when the question [in the action] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." A plaintiff moving for class certification must establish the existence of (1) an "ascertainable" class and (2) a "commonality" of interests among the members of the class. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1103–1104 [131 Cal.Rptr.2d 1, 63 P.3d 913].) "The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' " (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194], quoting *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439–440 [97 Cal.Rptr.2d 179, 2 P.3d 27].) Instead, the trial court's fundamental task in addressing a motion for class certification is to determine whether the issues which may be tried jointly, when juxtaposed against the issues which require separate adjudication, are so numerous or substantial that the use of class action procedures would be advantageous to the judicial process and to the litigants. (*Lockheed Martin Corp. v. Superior Court, supra*, 29 Cal.4th at pp. 1104–1105.)

The standard of review on appeal recognizes that the trial court's task in the class certification context involves a significant evaluation and assessment of the nature of the case, including a balancing of different interests: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 435.) This wide discretion vested in the trial court means that a trial court's ruling on a motion for class certification will not be disturbed on appeal unless the court applied "improper criteria" or " 'erroneous legal assumptions' " in making its decision. (*Id.* at pp. 435–436.) Or, as explained by the Supreme Court in more definitive language: " 'Any valid pertinent reason stated will be sufficient to uphold the order [denying class certification].' " (*Id.* at p. 436, quoting *Caro v. Procter & Gamble Co., supra*, 18 Cal.App.4th at p. 656.)

## II. *Ascertainability*

Cohen contends: "Contrary to the finding of the trial court, an ascertainable class exists." We agree.

After reading the various and varied cases cited by the parties, we find ourselves the most comfortable following the "ascertainability" discussion laid out by Division Seven of our court in *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908 [107 Cal.Rptr.2d 761] (*Hicks*), a case involving the alleged use of a defective building material in a new home development. In our view, Division Seven's discussion in *Hicks* articulates the best approach in evaluating the "ascertainability" issue. This is Division Seven's discussion:

■ "Although courts sometimes treat [ascertainability and commonality] as if they were one, they are better examined separately because they serve separate purposes.

"Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata. Common questions of law and fact are required in order to assure the interests of the litigants and the court are furthered by permitting the suit to proceed as a class action 'rather than in a multiplicity of separate suits.' [(*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].)]

"In the present case, the trial court concluded 'class membership under any of plaintiffs' causes of action [cannot] be ascertained without an individualized analysis of each putative class member's concrete slabs [because] manifest damage to a slab must exist as a precondition for class membership.'

■ "The trial court applied an improper criterion in determining ascertainability of the class. Manifest damage to a slab is not a 'precondition' for class membership. It is, if anything, an element in the proof of [defendant]'s liability and relates to the existence of common questions of law and fact, not ascertainability of the class. The court's reasoning is circular because it makes ascertainability depend on the outcome of the litigation on the merits. Our Supreme Court has held, however, courts may not consider the merits of the claim at the certification stage. [(*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 443.)]

"*Block v. Major League Baseball* [(1998) 65 Cal.App.4th 538 [76 Cal.Rptr.2d 567]] illustrates the difference between ascertainability and com-

monality for purposes of class certification. Block and four other former major league players brought a class action suit alleging defendants had violated their statutory and common law right of publicity by using their names, voices, signatures and photographs in various commercial products without consent or compensation. The class was defined as ' "all major league baseball players who played major league baseball before 1947, or, if they are now deceased, their heirs or beneficiaries." ' The appellate court held the complaint defined 'an ascertainable class, i.e., approximately 800 men (or their heirs and beneficiaries) who played major league baseball prior to 1947' but affirmed denial of class certification 'given the numerous complex issues the trial court would be required to evaluate for each member of the class if the action were certified.' The court found the class *ascertainable* even though it was not defined as former major league players whose voices, likenesses, etc., defendants used without their 'consent or compensation.' Rather, the court properly treated the lack of consent or compensation as an ultimate fact each class member would have to prove to establish liability.

■ "As explained in the leading treatise on class actions, ascertainability can be better achieved by defining the class in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary. The class certification order and notice to the class are the proper places to explain the relationship between the defined class and the legal claims being made in the case. [(2 Newberg on Class Actions (3d ed. 1992) § 6.14, p. 6-61.)]

"In the present case the complaint defined the class as homeowners whose homes contained Fibermesh foundations 'with manifested damage or defect due to the Fibermesh substitution . . . .' This definition is flawed for the reasons stated above, but the flaw is not fatal. A class is still ascertainable even if the definition pleads ultimate facts or conclusions of law. . . .

"The class in the case before us is ascertainable. It consists of the owners of homes in specified developments constructed and marketed by Kaufman in which Fibermesh was utilized in the concrete foundation slabs. As such, the class is precise, objective, and can be determined from public records and Kaufman's own records . . . ." (*Hicks, supra,* 89 Cal.App.4th at pp. 913–916, fns. omitted.)

In Cohen's current case, the proffered defined class is similarly "ascertainable." The defined class of all HD Package subscribers is precise, with objective characteristics and transactional parameters, and can be determined by DIRECTV's own account records. No more is needed.

DIRECTV and the trial court both cited *Akkerman v. Mecta Corp., Inc., supra,* 152 Cal.App.4th 1094 (*Akkerman*) for a different ascertainability conclusion. Although both DIRECTV and the trial court correctly interpreted the *Akkerman* opinion, we agree with Cohen that *Akkerman* should not be followed because it somewhat smudged the distinction between ascertainability and commonality. In other words, we follow the *Hicks* line of reasoning, not the *Akkerman* line of reasoning, with regard to the issue of ascertainability.

In *Akkerman,* the complaint alleged claims for deceptive advertising against the manufacturer of an electroconvulsive therapy (ECT) machine. According to the complaint, the named plaintiff and other class members underwent ECT in reliance on statements from doctors (falsely relayed from the manufacturer) that the treatment was safe. The trial court denied class certification, and Division Six of our court affirmed. This is Division Six's discussion of the "ascertainability" issue:

"In Akkerman's class certification motion, he defined the class as 'all members of the public who have received shock treatment in California from MECTA devices after September of 1997.' But the trial court reasonably could find that this definition is overbroad. Akkerman's causes of action for class relief involve allegations about patients who received ECT after relying on Mecta's misrepresentations about ECT risks. He claims Mecta disseminated a booklet, which falsely minimizes the risks of memory loss. But from this, the court could find that the class was more narrow than Akkerman's definition because it would involve only ECT patients *deceived* by Mecta. Moreover, Akkerman did not show how he could easily identify those who were deceived or distinguish between those patients and (1) patients who relied in whole or in part on their doctor's advice, or (2) those who relied on state-mandated ECT patient informed consent forms which disclose the risks. [Citations.] Akkerman does not claim that the state[-approved] informed consent forms are inadequate. But his class definition is so broad that it includes patients who were properly advised of the risks and those who relied on state-approved consent forms.

"Akkerman did not adequately define those who were entitled to restitution or the entities from which the class could seek relief. He initially sought class restitution limited to those who suffered 'brain damage and/or memory loss' as a result of ECT. But in his third amended UCL complaint, he sought restitution for all class members without limitation. That, however, would require a windfall award of restitution to all who received ECT even if the procedures were successful and beneficial.

"Akkerman claims the class is entitled to restitution for the money Mecta received from class members. But the class members paid hospitals for ECT

treatments, not Mecta. The hospitals are not parties to this action. Mecta manufactured the device; it did not perform ECT. Akkerman did not identify any class member who allegedly paid Mecta for ECT therapy.

"Akkerman also alleged that he was an adequate class representative for patients who were deceived by Mecta. But he does not claim that he ever read or received the Mecta booklet or that Mecta deceived him. Instead, his pleading named the doctor who told him the ECT procedure was safe, and who had relied '*in part*' on information from Mecta. He attached to his certification motion records from his Santa Barbara action. But from this, the trial court could find that Akkerman's individual claim involved medical malpractice, not Mecta's false advertising. Because that cause of action differs substantially from the typical claims of class members who allegedly relied on Mecta's booklet, the court could find that Akkerman was not an adequate representative for that class. [Citation.]

"Yet, even if Akkerman sought to represent a class of ECT patients misled by doctors who had read Mecta's booklet, the result would not change. That class would be too amorphous for certification. It would depend on the individual determinations of potentially thousands of medical 'intermediaries' who are not defendants or parties to this action and whose advice would necessarily 'vary' for each patient. [Citation.]" (*Akkerman, supra*, 152 Cal.App.4th at pp. 1100–1101.)

We agree with Cohen that the *Akkerman* court, in addressing the discrete issue of "ascertainability," smudged its discussion with ink that would be better used to discuss the separate but related issue of "commonality." In other words, the *Akkerman* court's discussion regarding the potential proof problems vis-à-vis liability, causation and damages—within the context of the issue of "ascertainability"—was misplaced within that discussion, and should have been reserved for its discussion of "commonality." Although the *Akkerman* court ultimately came to the correct decision that the trial court had properly denied class certification, we consider its decision to be better based on its assessment of the case's "commonality" aspects and elements, and we do not follow its "ascertainability" analysis.

III. *Commonality*

Cohen contends: "Contrary to the findings of the trial court, . . . commonality [exists because] common issues of fact and law would predominate over individualized issues." In light of the standard of review outlined above, Cohen's argument must be viewed to advance this two-part argument: (1) common issues of law would predominate over applicable law governing

individual class members, and (2) common issues of fact would predominate *as a matter of law* over individualized issues of fact. We reject both parts of Cohen's argument.

### A. *Common Issues of Law Do Not Predominate over the Defined Class*

In an undeveloped argument, Cohen contends in passing that common issues of law predominate over the class; he does not meaningfully challenge the trial court's conclusion that subscribers' legal rights may vary from one state to another state, and that subscribers outside of California may not be protected by the CLRA and UCL. Instead, Cohen proffers the proposition that the class could be redefined and limited to encompass only those subscribers to DIRECTV's HD Package who reside in California, not the United States. Although Cohen is correct that a trial court may redefine a proffered class where the evidence shows the redefined class would provide a manageable alternative (see, e.g., *Woosley v. State of California* (1992) 3 Cal.4th 758, 795 [13 Cal.Rptr.2d 30, 838 P.2d 758]), we conclude that redefinition of the class would not be a fruitful exercise in Cohen's current action because we find no error in the trial court's parallel finding that common issues of fact are lacking over the proposed class members.

### B. *Common Issues of Fact Do Not Predominate over the Defined Class*

The record supports the trial court's finding that common issues of fact do not predominate over the proposed class because the class would include subscribers who never saw DIRECTV advertisements or representations of any kind before deciding to purchase the company's HD services, and subscribers who only saw and/or relied upon advertisements that contained no mention of technical terms regarding bandwidth or pixels, and subscribers who purchased DIRECTV HD primarily based on word of mouth or because they saw DIRECTV's HD in a store or at a friend's or family member's home. In short, common issues of fact do not predominate over Cohen's proposed class because the members of the class stand in a myriad of different positions insofar as the essential allegation in the complaint. is concerned, namely, that DIRECTV violated the CLRA and the UCL by inducing subscribers to purchase HD services with false advertising.[4]

---

[4] Cohen's appellate briefs raise a potential theory of liability that was not part of his complaint and does not appear to have been argued below: that the quality of DIRECTV's compressed HD signal is so inferior that it is not in fact HD at all. Under that theory, Cohen contends, the commonality defects disappear because there is no dispute that all those who subscribed to DIRECTV's HD service did so in the belief they were getting an HD signal. We decline to reach the issue because it was not raised below, and express no opinion on whether

■ The trial court correctly ruled that actual reliance must be established for an award of damages under the CLRA. (See, e.g., *Buckland v. Threshold Enterprises, Ltd., supra*, 155 Cal.App.4th at pp. 809–811; *Caro v. Procter & Gamble Co., supra*, 18 Cal.App.4th at pp. 668–669.) ■ Although the rules under the UCL may or may not be different following our Supreme Court's recent decision in *In re Tobacco II Cases* (2009) 46 Cal.4th 298 [93 Cal.Rptr.3d 559, 207 P.3d 20] (*Tobacco II*), an issue which we address below, we do not understand the UCL to authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice. In other words, we find the trial court expressed a "valid reason" for denying class certification when it examined the nature of the claims in Cohen's case, and juxtaposed those claims against the respective positions of the class members. (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 436.)

The Supreme Court's recent decision in *Tobacco II, supra*, 46 Cal.4th 298 does not persuade us to reach a different conclusion. In *Tobacco II*, a group of plaintiffs comprised of smokers in California filed a class action against several tobacco companies. The complaint alleged a cause of action under the UCL based on a claim that the plaintiffs had become smokers after being exposed to the companies' false advertising and deceptive marketing activities within the state. After our state's voters passed Proposition 64 at the November 2004 general election, the tobacco companies filed a motion for an order decertifying the class action claims under the UCL, arguing that "each class member was now required to show an injury in fact . . . as a result of the alleged unfair competition." (*Tobacco II*, at p. 306.) The trial court granted the motion, and the Court of Appeal affirmed the trial court's order. The Supreme Court granted review.

On review, the Supreme Court specifically addressed two questions: "First, who in a UCL class action must comply with Proposition 64's *standing* requirements, the class representatives or all unnamed class members, in order for the class action to proceed? . . . Second, what is the causation requirement for purposes of establishing *standing* under the UCL . . . ?" (*Tobacco II, supra*, 46 Cal.4th at p. 306, italics added.) This past spring, the Supreme Court answered these two questions by ruling (1) only the class representatives must meet Proposition 64's *standing* requirements of actual injury and causation; (2) only the class representatives must establish reliance in accordance with fraudulent inducement principles in order for the class action to proceed; and (3) the class representatives do not have to show

our decision would have collateral estoppel effect should a new cause of action be brought on this new theory. (See *Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1513–1516 [83 Cal.Rptr.3d 607].)

reliance on particular advertisements or marketing materials with "unrealistic" specificity. (*Tobacco II, supra*, 46 Cal.4th at pp. 321–329.)

Viewed from the other direction, *Tobacco II* held that, *for purposes of standing* in context of the class certification issue in a "false advertising" case involving the UCL, the class members need not be assessed for the element of reliance. Or, in other words, class certification may not be defeated *on the ground of lack of standing* upon a showing that class members did not rely on false advertising. In short, *Tobacco II* essentially ruled that, *for purposes of standing*, as long as a single plaintiff is able to establish that he or she relied on a defendant's false advertising, a multitude of class members will also *have standing*, regardless of whether any of those class members have in any way relied upon the defendant's allegedly improper conduct.

■ In the contextual setting presented by Cohen's present case, we find *Tobacco II* to be irrelevant because the issue of "standing" simply is not the same thing as the issue of "commonality." Standing, generally speaking, is a matter addressed to the trial court's jurisdiction because a plaintiff who lacks standing cannot state a valid cause of action. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361 [87 Cal.Rptr.2d 654, 981 P.2d 499]; *McKinny v. Board of Trustees* (1982) 31 Cal.3d 79, 90 [181 Cal.Rptr. 549, 642 P.2d 460].) Commonality, on the other hand, and in the context of the class certification issue, is a matter addressed to the practicalities and utilities of litigating a class action in the trial court. We see no language in *Tobacco II* that suggests to us that the Supreme Court intended our state's trial courts to dispatch with an examination of commonality when addressing a motion for class certification. On the contrary, the Supreme Court reiterated the requirements for maintenance of a class action, including (1) an ascertainable class and (2) a " 'community of interest' " shared by the class members. (*Tobacco II, supra*, 46 Cal.4th at pp. 312–313.) In short, the trial court's concerns that the UCL and the CLRA claims alleged by Cohen and the other class members would involve factual questions associated with their reliance on DIRECTV's alleged false representations was a proper criterion for the court's consideration when examining "commonality" in the context of the subscribers' motion for class certification, even after *Tobacco II*.

Because the trial court did not apply an improper criterion in addressing the class certification issue, and because the trial court stated at least one valid reason for denying the motion for class certification, we decline to reverse the trial court's order. (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at pp. 435–436.)

## DISPOSITION

The trial court's order is affirmed. Respondent is to recover its costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 10, 2010, S177734. Werdegar, J., was of the opinion that the petition should be granted.