[No. B211968. Second Dist., Div. Four. Jan. 21, 2010.]

STEROID HORMONE PRODUCT CASES.

146

COUNSEL

Cohelan & Khoury, Timothy D. Cohelan, Isam C. Khoury; Clark & Markham, James M. Treglio and David R. Markham for Plaintiff and Appellant.

Orrick, Herrington & Sutcliffe, Kathleen D. Patterson, Rocky C. Tsai; McGuireWoods and Gordon W. Schmidt for Defendant and Respondent.

OPINION

**WILLHITE, J.**—This class action case is one of several coordinated cases involving over-the-counter sales of products containing anabolic steroids. The named plaintiff in this case, Diego Martinez, alleged causes of action against defendant General Nutrition Companies, Inc. (GNC), for violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (UCL) and the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) (CLRA), based upon GNC's sale of products that contained androstenediol, a substance defined as a schedule III controlled substance under California law.[1] (Health & Saf. Code, § 11056, subd. (f)(2).) It is unlawful in California to sell or possess a schedule III controlled substance without a prescription. (Health & Saf. Code, §§ 11377, 11379.)

Martinez sought to certify a class of all persons who purchased products containing androstenediol in California between February 17, 2000, and April 1, 2004. The trial court denied his motion to certify, finding that common issues did not predominate because class members would be required to individually litigate issues of causation and injury. Martinez appeals, arguing that the trial court's denial was based upon improper criteria or incorrect legal assumptions. We agree, and reverse the order denying certification.

## BACKGROUND

The original complaint in this case was filed in Contra Costa Superior Court in February 2004 by Santiago Guzman. In June 2004, the action was coordinated with five other class actions in Los Angeles Superior Court, as Judicial Council Coordination Proceeding No. 4363. Guzman subsequently amended his complaint to add Martinez and William Thomas as additional

---

[1] Although androstenediol was defined as a schedule III controlled substance under California law throughout the period relevant to this lawsuit, it was not considered a schedule III controlled substance under federal law until 2004. (See 21 U.S.C. §§ 812 [lists anabolic steroids as schedule III controlled substance], 802, as amended by Pub.L. No. 108-358, § 2(a)(1)(B) (Oct. 22, 2004) 118 Stat. 1661 [adding androstenediol to definition of anabolic steroid].)

named plaintiffs.[2] Guzman and Thomas eventually were dismissed from the action (for reasons unrelated to the present appeal), leaving only Martinez as the named plaintiff.

The operative complaint, the third amended complaint, alleged that GNC sold products containing androstenediol without requiring a prescription and without notifying customers that the products contained a controlled substance. The complaint alleged that, by selling the androstenediol products as over-the-counter nutritional supplements, GNC violated the CLRA, specifically Civil Code section 1770, subdivision (a)(2), (5), and (7).[3] The complaint also alleged that GNC's conduct violated the UCL because its sale of androstenediol products violated state statutes, including Health and Safety Code section 11056,[4] and because that same conduct violated the CLRA. Finally, the complaint alleged that plaintiffs were damaged (under the CLRA claim), and suffered injury and lost money (under the UCL claim), as a result of GNC's unlawful sale of a controlled substance. Martinez, on his own behalf and in behalf of all consumers who purchased androstenediol products from GNC in California, sought restitution and injunctive relief.[5]

Martinez moved for class certification in February 2008. He supported his motion with, among other things, (1) his declaration that he had spent over $2,500 on androstenediol products between 1999 and 2004, and that he would not have purchased those products had he known they were illegal to possess without a prescription; (2) a letter sent by California's Attorney General to GNC on September 12, 2003, to "assure that [GNC is] aware" that androstenediol is identified under the California Uniform Controlled Substances Act (Health & Saf. Code, § 11000 et seq.) as an anabolic steroid, and that the possession, import, or sale of it is a criminal offense; and (3) portions

---

[2] Thomas and Martinez had filed a class action complaint in San Diego County in March 2004 against GNC and other defendants based upon the failure of products containing androstenediol to perform as those defendants had advertised. Apparently, Thomas and Martinez's request to include that action in the coordinated proceedings was denied. Thomas and Martinez were added to Guzman's complaint in June 2005.

[3] Those subdivisions provide that the following unfair methods of competition or deceptive acts or practices are unlawful: "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (Civ. Code, § 1770, subd. (a)(2)); "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have" (Civ. Code, § 1770, subd. (a)(5)); or "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (Civ. Code, § 1770, subd. (a)(7)).

[4] We note that Health and Safety Code section 11056 simply sets out the substances that are schedule III controlled substances. Health and Safety Code section 11379 provides that the sale of a schedule III controlled substance without a prescription is unlawful.

[5] Although the complaint also included a claim for unjust enrichment, and included a prayer for compensatory and punitive damages under Civil Code section 1782, the motion for class certification sought certification only with regard to restitution and injunctive relief under the UCL and CLRA claims.

of the deposition transcript of GNC's designee, William J. Dunn, in which Mr. Dunn stated that GNC continued to sell androstenediol products until the end of March 2004. Martinez argued that all of the requirements for a class action were met: (1) the class is ascertainable because class membership is based upon objective criteria; (2) joinder of all class members would be impracticable because there are tens of thousands of class members; (3) common issues predominate because the claims are based upon a uniform practice by GNC and each class member suffered the same economic injury; (4) Martinez's claims are typical of the class because he purchased androstenediol products from GNC; (5) Martinez will adequately represent the class because he does not have a conflict of interest and his counsel is experienced in class action litigation; and (6) a class action is superior to other methods of adjudication because individual claims would be impracticable.

GNC opposed the motion for class certification on the grounds that (1) common issues do not predominate over individual issues because each class member will need to establish what information he or she relied upon in deciding to purchase androstenediol products and how he or she was injured by such purchases (which GNC argued would depend upon each class member's subjective belief as to the value of the product); and (2) Martinez's claims are not typical of the class and he is not an adequate representative because he sought to assert personal injury and efficacy claims rather than claims based upon the illegality of the products. GNC supported its opposition with, among other things, portions of Martinez's depositions from his original lawsuit (in which he challenged the efficacy and safety of androstenediol products sold by GNC and others) and the instant lawsuit. In those depositions, Martinez testified about the factors that went into his purchase of androstenediol products, and his concerns about those products, which appeared to be focused (in the deposition portions provided)[6] more on health risk issues rather than illegality issues.

The trial court denied the certification motion in September 2008. The court incorporated by reference its February 2008 ruling denying a class certification motion in one of the other coordinated cases (*Ayala v. Met-Rx USA, Inc.* (Super. Ct. L.A. County, 2008, No. BC289455) (*Ayala*)), in which the court found that common questions did not predominate as to causation and injury with regard to both the CLRA and UCL claims, because the

---

[6] Although the entire transcript of each deposition was included in the joint appendix on appeal, there is no indication that those transcripts were before the trial court—indeed, in the index to the joint appendix, the filing date for those transcripts (and another deposition transcript that was included) was listed as "N/A." Inclusion in a joint appendix of documents that were not filed with the trial court is improper. (Cal. Rules of Court, rule 8.124(g); *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 592, fn. 11 [86 Cal.Rptr.3d 784].) We do not consider any portion of the depositions that was not submitted in support of or in opposition to the motion for class certification.

plaintiffs did not satisfy their "burden to produce substantial evidence that a majority of class members would find the alleged injury—illegality of a sale—to be material." The court noted that, although the plaintiffs declared that "*they* would not have bought the products had they known they were illegal . . . recent events in the sporting world demonstrate [that] plaintiffs' views are not universal." The court concluded, "there is little if any evidence that consumers care whether andro[stenediol] products are restricted. Therefore, the issue of causation (i.e., whether defendant's implicit representation of legality induced consumers to purchase the products) 'would vary from consumer to consumer.' [Citation.] Because materiality of the representation is not uniform, reliance on it cannot be inferred classwide."

In its ruling on Martinez's motion, the court reiterated that "the central issue" under both the CLRA and the UCL was "whether the illicit nature of defendant's products was material to those who purchased them," and that "[t]o recover, . . . each class member must demonstrate, or it must be inferable classwide, that the alleged injury was material." The court concluded that materiality could not be inferred classwide, observing that it "requires no imaginative leap" to conclude that there exist "person[s] to whom legality is immaterial," because "andro[stenediol] products are classified only as Schedule III substances; the proscriptions asserted by plaintiffs apply only against distributors, not buyers;[7] and at any rate, a substantial black market exists in disregard of *any* proscription." Therefore, as in *Ayala*, the court found that establishing causation and injury under both the CLRA and the UCL required an individualized inquiry into whether the illegality of the androstenediol products was material to each class member, and thus individual issues predominated over common issues.

Martinez timely filed a notice of appeal from the order denying class certification.

## DISCUSSION

### A. *Standards for Class Actions*

 Code of Civil Procedure section 382, which governs UCL claims brought as class actions (see Bus. & Prof. Code, § 17203), allows the maintenance of a class action when the plaintiff can "establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.] The community of interest requirement

---

[7] The trial court was mistaken that the proscriptions apply only against distributors, and not buyers. Health and Safety Code section 11377, subdivision (a) provides that *possession* of a schedule III controlled substance without a prescription is a criminal offense punishable by imprisonment in county jail for less than a year or in state prison.

involves three factors: '(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.] Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing" (*Linder v. Thrifty Oil. Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*).)

■ A CLRA claim brought as a class action is governed exclusively by Civil Code section 1781, which sets out the four conditions that, if met, mandate certification of a class: "(1) It is impracticable to bring all members of the class before the court. [¶] (2) The questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members. [¶] (3) The claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class. [¶] (4) The representative plaintiffs will fairly and adequately protect the interests of the class." (Civ. Code, § 1781, subd. (b); see *Hogya v. Superior Court* (1977) 75 Cal.App.3d 122, 140 [142 Cal.Rptr. 325].) The trial court, however, has "considerable latitude" under those four conditions in deciding whether a class action is proper. (*Hogya, supra*, 75 Cal.App.3d at p. 139.)

Under either statute, "[t]he certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' [Citation.] A trial court ruling on a certification motion determines 'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]" (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194].) "[A] trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]' [citation]. Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal ' "even though there may be substantial evidence to support the court's order." ' [Citations.] Accordingly, we must examine the trial court's reasons for denying class certification." (*Linder, supra*, 23 Cal.4th at pp. 435–436.)

In the present case, the trial court denied class certification on the ground that, with regard to both the UCL claim and the CLRA claim, an individualized inquiry would have to be conducted into whether the illegality of androstenediol products was material to each purchaser, to determine whether GNC's alleged conduct caused injury to that purchaser. We examine this reason as it pertains to each of Martinez's claims.

B. *The UCL Claim*

■ "The UCL defines unfair competition as 'any unlawful, unfair or fraudulent business act or practice . . . .' ([Bus. & Prof. Code,] § 17200.) Therefore, under the statute 'there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent.' [Citation.]" (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20] (*Tobacco II*).) If a defendant is found to have engaged in any of the three varieties of unfair competition, "[t]he court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203.) The focus of the UCL is "on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." (*Tobacco II, supra*, 46 Cal.4th at p. 312.)

Before the November 2004 General Election, when the voters approved Proposition 64, California courts consistently held that liability for restitution under the UCL could be imposed against a defendant without any individualized proof of causation or injury; the plaintiff needed only to show that the defendant engaged in a practice that was unlawful, unfair, or fraudulent and that the defendant may have acquired money or property by means of that practice. (*Tobacco II, supra*, 46 Cal.4th at p. 320; see also *Massachusetts Mutual Life Ins. Co v. Superior Court* (2002) 97 Cal.App.4th 1282, 1288 [119 Cal.Rptr.2d 190] (*Massachusetts Mutual*).) Proposition 64 changed this. It amended the UCL to provide that a private action for relief may be maintained only if the person bringing the action "has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204.)

■ Questions arose as to the effect of the Proposition 64 amendments on UCL class actions, particularly whether each class member must now establish that he or she suffered injury in fact and lost money as a result of the unfair competition. The California Supreme Court answered this question in *Tobacco II*, concluding that the standing provision added by Proposition 64 "was not intended to have any effect at all on unnamed members of UCL class actions." (*Tobacco II, supra*, 46 Cal.4th at p. 321.) Therefore, while a named plaintiff in a UCL class action now must show that he or she suffered injury in fact and lost money or property as a result of the unfair competition, once the named plaintiff meets that burden, no further individualized proof of injury or causation is required to impose restitution liability against the defendant in favor of absent class members.

In the present case, the trial court—without the benefit of the Supreme Court decision in *Tobacco II*, which was issued several months after the class certification ruling at issue here—concluded that Proposition 64 *did* have an effect on unnamed class members. The court noted that "[b]efore November 2004, 'relief under the UCL, including restitution, [was] available without proof of individual deception, reliance and injury,' " but "after Proposition 64, the class may obtain restitution only upon a showing of reliance and causation." Based upon this legal assumption, the court found that individual issues predominated because each class member would need to show that he or she was injured by GNC's alleged unlawful sale of androstenediol products, which the court determined was dependant upon whether the legality of the sale was material to him or her. Because that legal assumption was erroneous, reversal of the order denying class certification as to the UCL claim is required.[8] (*Linder, supra,* 23 Cal.4th at pp. 435–436.) Martinez's UCL claim presents two predominate issues (other than Martinez's individual standing), both of which are common to the class: (1) whether GNC's sale of androstenediol products was unlawful; and if so, (2) the amount of money GNC "may have . . . acquired by means of" those sales that must be restored to the class (Bus. & Prof. Code, § 17203).

## C. *The CLRA Claim*

The CLRA claim requires a different analysis than the UCL claim, because the CLRA requires a showing of actual injury as to each class member. The CLRA makes unlawful various "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." (Civ. Code, § 1770, subd. (a).) It allows "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice" to bring an action to recover or obtain actual damages, injunctive relief, restitution, and/or punitive damages. (Civ. Code, § 1780, subd. (a).) It also provides that "[a]ny consumer entitled to bring an action under Section 1780 may, if the unlawful method, act, or practice has caused damage to other consumers similarly situated, bring an action on behalf of himself and such other consumers to recover damages or obtain other relief as provided for in Section 1780." (Civ. Code, § 1781, subd. (a).)

---

[8] GNC tries to avoid the required reversal by arguing in its respondent's brief that the trial court's ruling does not conflict with *Tobacco II* because *Tobacco II* addressed standing, while the trial court specifically stated that standing was irrelevant to the certification analysis. Although the court did state that standing was irrelevant, it nevertheless found that Proposition 64 added actual injury as an element of a cause of action for restitution under the UCL, and therefore injury must be established for each class member. *Tobacco II* made clear, however, that Proposition 64 only affected the named plaintiff's standing in a UCL class action seeking restitution; it did not add an additional element to be satisfied by all class members. (*Tobacco II, supra,* 46 Cal.4th at p. 321.)

■ This statutory language makes clear that, to obtain relief under the CLRA, both the named plaintiff and unnamed class members must have suffered some damage caused by a practice deemed unlawful under Civil Code section 1770. (See *Massachusetts Mutual, supra*, 97 Cal.App.4th at p. 1292.) Here, Martinez alleged that GNC deceptively sold androstenediol products as legal over-the-counter supplements, and that he was damaged because he bought products that he would not have bought had he known they were not legal to possess.

In moving for certification of the class, Martinez argued that causation and injury could be established by showing that the alleged misrepresentation— that the androstenediol products were legal over-the-counter supplements— was material, and therefore was an issue common to the class. In opposing the motion, GNC argued that the issue was not common to the class because "the existence and manner of incurring damages" for each class member would depend upon each class member's subjective belief regarding the "actual value" of the androstenediol products he or she bought. In denying class certification, the trial court agreed that the causation/injury issue depended upon materiality, but found that materiality could not be decided on a classwide basis because "the illicit nature of a product impacts its value only to the extent the buyer knows about the illegality or cares," and the perceived value was an issue requiring an individualized inquiry.

■ In ruling that the materiality question depended upon each class member's subjective belief regarding value, the trial court was led astray by GNC's erroneous legal assumption. GNC's argument that the examination of each class member's subjective belief was necessary was based upon its assumption that the showing of "damage" required under the CLRA is governed by Civil Code section 3343, i.e., the measure of actual damages for persons defrauded in the purchase of property. That assumption is incorrect. The "damage" that a plaintiff in a CLRA action must show under Civil Code section 1780, subdivision (a) is "any damage," which "is not synonymous with 'actual damages' " and "may encompass harms other than pecuniary damages." (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 640 [88 Cal.Rptr.3d 859, 200 P.3d 295].)

■ The "damage" Martinez alleged in this case is that, in reliance on GNC's deceptive conduct, he bought an illegal product he would not have bought had he known it was illegal. He does not seek actual damages, but instead seeks restitution. He correctly argues that he is entitled to show that GNC's alleged deceptive conduct caused the same damage to the class by showing that the alleged misrepresentation was material, even if GNC might be able to show that some class members would have bought the products even if they had known they were unlawful to sell or possess without a

prescription.[9] (*Massachusetts Mutual, supra,* 97 Cal.App.4th at p. 1292 [" 'Causation as to each class member is commonly proved more likely than not by materiality. That showing will undoubtedly be conclusive as to most of the class. The fact a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all.' "].) In other words, if Martinez can show that " 'material misrepresentations were made to the class members, at least an inference of reliance [i.e., causation/injury] would arise as to the entire class.' " (*Id.* at pp. 1292–1293, quoting *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814 [94 Cal.Rptr. 796, 484 P.2d 964].)

Materiality of the alleged misrepresentation generally is judged by a "reasonable man" standard. In other words, a misrepresentation is deemed material "if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' [citations], and as such materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.' " (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 [64 Cal.Rptr.2d 843, 938 P.2d 903]; accord, *Tobacco II, supra,* 46 Cal.4th at p. 327.) Thus, the question that must be answered in this case is whether a reasonable person would find it important when determining whether to purchase a product that it is unlawful to sell or possess that product. It requires no stretch to conclude that the proper answer is "yes"—we assume that a reasonable person would not knowingly commit a criminal act. (Cf. *Garnette v. Mankel* (1945) 71 Cal.App.2d 783, 787 [163 P.2d 466]; Civ. Code, § 3548.)

GNC appears to argue that the proper analysis is not whether legality is important to a generic reasonable person but rather, whether it is important to bodybuilders, and Martinez failed to establish materiality because he failed to show that the legality of the androstenediol products is important to bodybuilders. Even if the reasonable person standard must be applied in this case from the perspective of a reasonable bodybuilder (although there is no evidence that bodybuilders were the only people who purchased androstenediol products from GNC), there is no reason to believe that, as a rule, bodybuilders care less about legality than nonbodybuilders. And even if there may be some people who bought androstenediol products from GNC with the knowledge that the products were unlawful to sell or possess in California without a prescription—and there is no *evidence* in the record that there are—their existence would not defeat class certification.

---

[9] We note that GNC presented no such evidence in opposition to the class certification motion.

Because the denial of class certification of the CLRA claim was based upon an erroneous legal assumption, the ruling must be reversed.

### D. *Recent Appellate Cases on Class Certification*

After we issued our opinion, GNC petitioned for rehearing, arguing that two recent cases from the Second Appellate District—*Cohen v. DIRECTV, Inc.* (2009) 178 Cal.App.4th 966 [101 Cal.Rptr.3d 37] (*Cohen*) and *In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116 [103 Cal.Rptr.3d 83] (*Vioxx*)—support the trial court's denial of class certification in this case. Both cases are distinguishable.

In *Cohen*, the plaintiff alleged that DIRECTV violated the UCL and the CLRA by inducing subscribers to purchase high definition television services through misrepresentations in DIRECTV's advertising that DIRECTV's broadcast of those channels would meet certain technical specifications. (*Cohen, supra*, 178 Cal.App.4th at pp. 969–970.) In opposing class certification, DIRECTV submitted evidence that many subscribers had never seen, or did not remember seeing, advertisements with the alleged misrepresentations about the technical specifications, and purchased the services at issue due to other factors. (*Id.* at p. 970.) The trial court found that common issues of fact did not predominate because the allegedly fraudulent representations were not uniformly made to or considered by the class members. (*Id.* at p. 973.)

The appellate court affirmed. In discussing the UCL claim, the appellate court noted that *Tobacco II, supra*, 46 Cal.4th 298, was irrelevant to class certification because it addressed only the issue of standing, and did not instruct "our state's trial courts to dispatch with an examination of commonality when addressing a motion for class certification." (*Cohen, supra*, 178 Cal.App.4th at p. 981.) The court then concluded that the trial court's concern that the plaintiff's UCL and CLRA claims would involve individual factual issues regarding class members' reliance on the alleged misrepresentations "was a proper criterion for the court's consideration when examining 'commonality' in the context of the subscribers' motion for class certification, even after *Tobacco II*." (*Cohen*, at p. 981.)

We agree that *Tobacco II* did not dispense with the commonality requirement for class certification. But to the extent the appellate court's opinion might be understood to hold that plaintiffs must show class members' reliance on the alleged misrepresentations under the UCL, we disagree. As *Tobacco II* made clear, Proposition 64 did not change the substantive law governing UCL claims, other than the standing requirements for the named plaintiffs, and "before Proposition 64, 'California courts have repeatedly held that relief under the UCL is available without individualized proof of deception, reliance and injury.' [Citation.]" (*Tobacco II, supra*, 46 Cal.4th at

p. 326.) But in any event, the *Cohen* court's discussion regarding the appropriateness of considering class members' reliance when examining commonality is irrelevant here, where the UCL claim is based upon the unlawful prong of the UCL and thus presents no issue regarding reliance.

*Vioxx* is similarly distinguishable. In that case, the plaintiffs asserted causes of action under the UCL and CLRA based upon allegations that the manufacturer of the medication Vioxx knew about cardiovascular risks associated with the medication but engaged in a campaign to hide or explain away those risks. (*Vioxx, supra*, 180 Cal.App.4th at p. 120.) The plaintiffs asserted that Vioxx was no more effective, and less safe, than a generic medication and that it was more expensive than that generic medication. They alleged that the manufacturer misled consumers into buying the more expensive Vioxx, and therefore consumers were entitled to recover the difference between the cost of Vioxx and the cost of the generic medication. (*Id.* at p. 122.)

The trial court denied class certification largely on the ground that common issues did not predominate because two key aspects of the plaintiffs' case required individual inquiry. The court found—based upon extensive medical and other evidence—that the determination of whether Vioxx was no more effective and less safe than the generic medication "is dependent on each individual patient's specific medical needs and history," as is the determination of whether the more expensive Vioxx was better than the generic medication. (*Vioxx, supra*, 180 Cal.App.4th at p. 126.) In other words, the court found that the basic premise of the plaintiffs' claims—that the manufacturer misrepresented the effectiveness and safety of Vioxx, which deceived patients into paying more for a medication than it was worth—could not be proved on a classwide basis. Thus, the trial court denied class certification. (*Id.* at pp. 126–127.)

The appellate court affirmed. As to the CLRA claim, the appellate court concluded that, in light of the individualized issues regarding Vioxx's effectiveness and safety, the trial court was correct that the plaintiffs could not establish materiality and reliance on a classwide basis. (*Vioxx, supra*, 180 Cal.App.4th at pp. 133–134.) As to the UCL claim, the appellate court noted that the plaintiffs needed to be able to show the existence of a " 'measurable amount' " of restitution supported by the evidence, and the plaintiffs' assertion that that amount is the difference between the cost of Vioxx and the cost of the generic medication failed because the generic medication was not a valid comparator due to the differences among patients who take those kinds of medications. (180 Cal.App.4th at p. 136.)

Neither issue is relevant to this case. As we explained, there is no impediment to establishing reliance on a classwide basis for the CLRA claim

in this case because it can be established by showing that the alleged misrepresentation—that the androstenediol products were legal—was material. And with regard to the UCL claim, unlike the allegations in *Vioxx*, where the plaintiffs put valuation at issue by alleging that due to the alleged misrepresentations they paid more for a medication than it was worth, in this case Martinez does not put valuation at issue when he alleges that he bought a product that was illegal to sell or possess.

In short, neither *Cohen* nor *Vioxx* has any impact on our analysis of this case.

## DISPOSITION

The order denying class certification is reversed. Martinez shall recover his costs on appeal.

Epstein, P. J., and Suzukawa, J., concurred.

A petition for a rehearing was denied February 8, 2010, and the opinion was modified to read as printed above. The petition of respondent General Nutrition Companies, Inc., for review by the Supreme Court was denied April 14, 2010, S180584. George, C. J., did not participate therein.